**BRASCAN LIMITED, Brascan Holdings Inc., and Brascan U. S. A. Inc., Plaintiffs,**

v.

**EDPER EQUITIES LTD.,** Peter Bronfman, Edward Bronfman, J. Trevor Eyton, Edper Investments Ltd., Patino, N. V., Balfour Securities Co., John Does and Richard Roes, Defendants.

**No. 79 Civ. 2288 (PNL).**

United States District Court, S. D. New York.

May 25, 1979.

Revised June 7, 1979.

774

Simpson, Thacher & Bartlett, New York City, for plaintiffs; Roy L. Reardon, New York City, of counsel.

Cahill, Gordon & Reindel, New York City, for defendants Edper Equities Ltd., Peter Bronfman, J. Trevor Eyton and Edper Investments Ltd.; Raymond L. Falls, Jr., New York City, of counsel.

Chadbourne, Parke, Whiteside & Wolff, New York City, for defendant Patino; Donald I. Strauber, New York City, of counsel.

Securities and Exchange Commission as Amicus Curiae, John Huber, Washington, D. C.

## GENERAL NARRATIVE

LEVAL, District Judge.

Brascan Ltd. ("Brascan") is a Canadian publicly held company whose 26,100,000 common shares are held by some 50,000 stockholders and are traded on the Toronto, Montreal, London and American Stock Exchanges.

In late 1978 Brascan announced the sale of its principal subsidiary, an electric utility in Brazil, for $380 million (U.S.) cash. Shortly thereafter Edper Investments Ltd. ("Edper Investments"), a privately held Canadian venture capital company, became interested in acquiring Brascan shares. Edper Investments made some purchases in late 1978 and early 1979. In March, 1979 Edper Investments joined with Patino, N.V. ("Patino"), a privately held Netherlands company, to create Edper Equities Ltd. ("Edper"), a corporate entity formed for the purpose of attempting to obtain either control, or a major portion, of Brascan shares. Edper is the principal defendant in this action. At the end of March, 1979 Edper owned approximately 5% of the outstanding Brascan shares.

Edper approached Brascan on April 5 with a proposal for a friendly acquisition. The next day the Brascan board resolved to make a tender offer for all the outstanding shares of F. W. Woolworth Co. ("Woolworth"). Edper's overtures were rebuffed.

In the days which followed, Edper embarked on an intensive examination of Brascan's position. Edper concluded that an acquisition of Woolworth by Brascan would be detrimental to Brascan's interests. Several courses of action were considered by Edper with a view to acquiring a dominant stake in Brascan. Among these were an offer on the Toronto Stock Exchange for a controlling interest in Brascan shares, conditioned on Brascan's abandoning its offer for Woolworth stock and purchases of Brascan's shares on the American Stock Exchange (the "AMEX"). Edper also considered disposing of its interest in Brascan in view of the Woolworth offer. Edper's Toronto conditional offer was abandoned April 20 when the Ontario Securities Commission ("O.S.C.") denied permission to proceed. A few days after the O.S.C.'s decision, Edper began to give more serious consideration to purchases over the AMEX. At a meeting on April 29 a tentative decision was made to proceed in this fashion. Edper's initial objective was to increase its holding to 10%, for three reasons. First, a 10% holder is entitled under Section 103(1) of the Canada Corporations Act to cause a stockholders meeting to be summoned. Second, Edper believed that with a position of this size it might induce Brascan's management to take its opposition seriously and drop the Woolworth offer. Third, Edper thought it needed more stock in order to carry more weight in expressing its views at a hearing which the New York Attorney General had set for May 10 on the Brascan Woolworth offering. However, no firm decision to purchase Brascan shares on the AMEX was made until the early morning of April 30.

During the period already discussed, nothing which Edper had stated or done was false, misleading, manipulative or violative of any law.

On April 30, Edper, through, Balfour Securities Co. ("Balfour" or "Balfour Securities"), a New York broker, purchased in excess of three million Brascan shares on

the AMEX. That evening, in response to requests from the O.S.C. and the Toronto Stock Exchange, Edper issued a press release identifying itself as the purchaser. Answering a press inquiry on that release, an Edper representative said that Edper did not then plan to buy more Brascan shares. The statement was accurate when made and reflected a decision made by Edper's management after trading closed on April 30. This statement was published the morning of May 1 in the Wall Street Journal.

On the morning of May 1 Edper's management reconsidered their decision, recognizing that additional purchases of Brascan stock were necessary to protect their investment. Observing that Brascan's management was undeterred by Edper's April 30 acquisitions and hearing that more stock was available at prices comparable to those of the prior day, Edper decided to resume purchasing. Without issuing a further public statement, Edper reentered the market and on May 1 again acquired more than three million shares of Brascan on the AMEX.

During April, Edper had occasionally consulted with James Connacher, a Canadian broker who was knowledgeable about Brascan shares, about the possibility of Edper's acquiring a major position in Brascan shares. On April 29 at Edper's request, Connacher accompanied Price, an Edper man who was sent to New York to execute Edper's purchasing strategy, and gave Price help and advice concerning the selection of a broker, negotiating commissions and the hedging of foreign exchange in order to make payment.

During April 30 and May 1, Connacher and his firm, Gordon Securities, acting independently of Edper, contacted between 30 and 50 large (mostly institutional) shareholders of Brascan and, as broker for these holders, brought to the market a large percentage of the stock purchased by Edper on those two days. Gordon Securities also purchased Brascan shares for its own account in Canada and resold them to Edper on the floor of the AMEX.

On the evening of May 1 Brascan obtained an *ex parte* temporary restraining order in Part I of this court, barring Edper, *inter alia*, from exercising stockholders' rights with respect to any of its shares and from making any further purchases. A hearing was held on May 16, 17 and 18 on Brascan's motion for a preliminary injunction. Briefs were filed on May 21 and argument was held May 22.

*Jurisdiction, Venue and Relief Sought.*

Brascan alleges violations of Sections 10(b), 13(d), 14(d), and 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78m(d), 78n(d), and 78n(e), and moves for a preliminary injunction barring all defendants, other than Balfour Securities, Gordon Securities Inc., Gordon Securities Limited and James Connacher, from acquiring any further Brascan shares; soliciting any proxy or other authorization or agreement to vote Brascan shares; voting any Brascan stock which they now own; or exercising any incidents of ownership with respect to the Brascan stock they own as a means of affecting Brascan's management. Brascan also seeks an order directing Edper to divest itself of all Brascan stock which it has purchased on April 30 and May 1, 1979.

Jurisdiction of this action and venue in this District lie under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

*The Parties and Others Involved.*

Plaintiff Brascan is a publicly held corporation organized and existing under the laws of Canada with its principal place of business located in Toronto, Province of Ontario, Canada. Plaintiffs Brascan Holdings Inc. ("Brascan Holdings") and Brascan U.S.A. Inc. ("Brascan U.S.A.") are organized and existing under the laws of Delaware, with their principal places of business located in New York, New York. Brascan Holdings is a wholly-owned subsidiary of Brascan and Brascan U.S.A. is a wholly-owned subsidiary of Brascan Holdings. Both were formed for the purpose of facilitating the making of a tender offer by

Brascan for all the outstanding shares of common stock of Woolworth.

Defendant Edper is a Canadian corporation with its principal place of business in Toronto, Canada. Edper was formed in late March, 1979, for the purpose of acquiring effective control of Brascan. Defendant Edper Investments Ltd. and defendant Patino, N.V. are privately held venture capital companies, and are the sole shareholders of Edper. Defendants Peter and Edward Bronfman are directors and shareholders of Edper Investments. Defendant J. Trevor Eyton is a director of and legal counsel to Edper. Jack Cockwell is treasurer of Edper Equities and executive vice president of Edper Investments. Timothy Price is vice president of both Edper Equities and Edper Investments. Jaime Ortiz-Patino is a director of Edper Equities. He is also a director of Patino. Patrick Keenan is president of Edper. He is also president, chief executive and a director of a Patino company. Frederick McCutcheon is a Toronto stockbroker. He is also a director of both Patino and Edper.

Defendant Balfour Securities is a securities dealer which transacts business on the American Stock Exchange. Jay Goldsmith is the president of Balfour. A. G. Becker & Co. ("Becker") is a clearing broker for Balfour.

Defendant Gordon Securities Ltd. ("Gordon Securities" or "Gordon") is a brokerage firm with its main office in Toronto, Canada. It also maintains branch offices in Montreal and Calgary. Its wholly-owned subsidiary, defendant Gordon Securities, Inc., has an office in New York City and transacts business on the AMEX. Defendant James Connacher is President of Gordon Securities Ltd.

### Detailed Findings of Fact.

Edper Investment's initial purchase of 50,000 Brascan shares was made in late December, 1978, after Brascan had announced the sale of its principal subsidiary, an electric utility in Brazil ("Light"), to the Government of Brazil for $380 million (U.S.). The purchases were made for investment and in anticipation of either a cash distribution by Brascan of the proceeds of the sale of Light or an offer by a third party, attracted by the cash, to purchase Brascan shares at a premium over the market.

In early January, Price of Edper Investments indicated to Connacher of Gordon Securities that Edper Investments was seriously looking at Brascan as a possible acquisition candidate. On or about January 15, 1979, Gordon purchased 100,000 shares of Brascan stock for an Edper company. On or about February 15, 1979, Connacher and a research analyst from Gordon Securities, David Dorian, met with Cockwell and Price of Edper Investments. The principal focus of the meeting was a discussion between Cockwell and Dorian concerning their respective analyses of the value of Brascan shares. Connacher also told Cockwell who were some of the large Brascan shareholders. Toward the end of February, Connacher's firm purchased 650,000 Brascan shares for Edper Investments.

In January, 1979, Eyton and Keenan had brief discussions relating to the possibility of Edper Investments and Patino investing jointly in Brascan shares. These initial contacts resulted in a meeting between representatives of Edper Investments and Patino on February 20, 1979, at which time Edper Investments proposed that the two groups participate together in a bid for control of Brascan. Another meeting at which this subject was discussed was held on February 27, 1979. On that date Patino also commenced purchasing Brascan shares. On March 26, 1979, an arrangement between Edper Investments and Patino was formalized and Edper was created as a jointly owned vehicle, owned ⅔ by Edper Investments and ⅓ by Patino, for carrying out acquisitions. By that date, Edper Investments owned 800,000, and Patino 460,000 Brascan shares. This amounted to approximately 5% of Brascan's outstanding common stock, which was contributed to Edper.

On March 30, 1979, at Eyton's request, Brascan's investment banker in Canada arranged for Edper representatives to meet

with Moore, Chairman of the Brascan Board, on April 5, 1979.

At the April 5 secret meeting, the Edper representatives informed Moore of Edper's holdings in Brascan and that Edper was considering making a bid for effective control of Brascan. At that time, Edper was contemplating making a bid through the facilities of the Toronto Stock Exchange, and was hoping for Brascan's endorsement.[1] Edper offered Brascan assurances with respect to managerial continuity and the like. Moore noted that it was not the board's policy to recommend to shareholders offers for less than all of the outstanding shares, but stated that his Board was to meet the next day. Edper requested a response after the Board meeting and was told it might expect response in the afternoon of April 6.

The Brascan Board convened on April 6. At that meeting, it resolved to make a tender offer for all the outstanding shares of Woolworth's common stock.[2] That afternoon, Eyton delivered a letter on behalf of Edper to the Brascan Board Meeting (Exhibit 5). The letter confirmed Edper's interest in Brascan, stating that Edper was considering making a bid for 45% of the outstanding Brascan shares at $27 Cdn. per share.

On April 9, 1979, having received no response from Brascan, Eyton contacted Brascan's Canadian counsel at 7:45 a. m. to read him the text of a release which Edper proposed to issue concerning its contemplated offer to purchase in Canada 11.7 million shares of Brascan stock. Immediately thereafter, the press release was made available to the financial press. The press release, in part, stated:

"Edper Equities Ltd. . . . announced today it is considering making an offer to purchase 11.7 million Class A common shares of Brascan Limited at the price of Cdn. $28 per share. Edper noted that it presently holds approximately 1.3 million Class A common shares so that, on completion of a successful offer, the aggregate holding would amount to approximately 13 million Class A common shares representing approximately 50% of the outstanding voting shares." (Exhibit 6A).

It further announced that any bid by Edper would be conditioned upon no action being taken by Brascan management which would effect a material change in the affairs of Brascan.

Later that morning, Brascan publicly announced its proposed tender offer for all the outstanding common stock of Woolworth. At about noon that day, Brascan's Canadian counsel called Eyton to advise that Brascan's management did not consider Edper's offer to be in the best interests of Brascan or its shareholders.

Edper then proceeded to obtain as much information as it could secure in an effort to evaluate the Woolworth offer. Keenan was knowledgeable about Woolworth, and was in a position to give immediate advice about what the Woolworth acquisition would mean to Brascan. By April 10, Edper had in its possession a report on Woolworth prepared by The Wertheim Group, as well as information found in financial publications and other sources available from the financial community concerning Woolworth. In addition, Edper discussed Woolworth with individuals who were know-

1. During the latter part of March and the early days of April, Edper was involved in negotiations with two Canadian banks, the Bank of Montreal and the Toronto-Dominion Bank, to arrange financing for its acquisition of Brascan stock. The arrangement was formalized on April 6, 1979. Under the agreement utilization of this $210 million (Cdn.) credit would have required Edper to acquire at least 50.01% of Brascan's stock within 90 days of its borrowing. Edper has not borrowed any money under this arrangement, and accordingly has incurred no obligations under the agreement.

2. Allegations have been made as to the motives of and the means by which the Brascan Board adopted its resolution to acquire the stock of Woolworth. This issue was not put before the Court, and in any event, such questions are not germane to this lawsuit. I neither make nor imply any findings concerning the motives behind the offer, the manner in which the Board decided to pursue the offer, or the advisability of the offer.

ledgeable about the retail industry. Cockwell of Edper prepared a cash flow analysis in order to establish the effect of the proposed Woolworth transaction on the cash flow of the combined enterprises. Edper concluded that the Woolworth acquisition would reduce the intrinsic value of Brascan shares by an amount in excess of $10.00 per share and produce a negative combined cash flow.

On April 10, 1979, Edper published two press releases. The first, issued at noon (Exhibit 7) stated that Edper was considering whether or not to proceed with its contemplated offer to purchase 11.7 million shares in view of Brascan's announcement of the proposed Woolworth tender offer. The release stated that such an acquisition involving borrowings of $800 million would effect a "material change" in the affairs of Brascan, "particularly so when the Brascan offer for Woolworth was apparently going to be vigorously resisted." The release concluded that a decision whether to proceed would be made later that day.

At 9:00 p. m. Edper issued a second press release announcing that it would not be proceeding with its offer in view of the Woolworth offer (Exhibit 8). The release stated that Edper was "now assessing its position as one of Brascan's major shareholders holding something over 5% of its outstanding common shares", that a successful Woolworth bid "would convert Brascan from a highly liquid company . . . to a debt-burdened company" and that "the acquisition of Woolworth by Brascan would have an immediate negative impact on Brascan's consolidated cash flows. . . . On this basis, Edper considered that the Woolworth transaction was not in the best interest of Brascan or its shareholders." The release also indicated that a number of major Brascan shareholders had expressed their concerns and that Brascan's management was giving little consideration to the interests of its shareholders. Edper noted that Brascan management had not sought

shareholder approval of either the sale of Light or the Woolworth acquisition. Edper commented that Brascan shareholders felt that the Woolworth transaction "would have the effect of precluding Edper or any other person from making a bid for the outstanding Brascan shares at a premium over their market price." This release also concluded by stating Edper's view that the Brascan offer for Woolworth would be vigorously resisted.[4]

During the week of April 9, following Brascan's announcement of its offer for Woolworth stock, the Edper group held several meetings to discuss the various alternatives available to them.

The agendas for the meetings held by the Edper group the weeks of April 9 and 16 listed, as topics of discussion and as tasks to be allocated, contact with Brascan shareholders. Edper's contacts with the shareholders of Brascan was confined in large part to an exchange of views on the advisability of the Woolworth offer. There is no evidence that at any point prior to April 30 Edper discussed with Brascan shareholders the availability of their Brascan stock for possible sale.

During the week of April 16, Edper began to consider seriously, from among the alternatives available to it, the making of a "conditional" offer for 11.7 million shares of Brascan stock over the facilities of the Toronto Stock Exchange, such an offer to be conditioned upon the abandonment or failure of the Woolworth offer. Under Ontario law, the making of such an offer, required specific approval of the Ontario Securities Commission, to which Edper applied on April 17.

On April 19, a hearing was held before the Ontario Securities Commission. Edper's application was opposed by Brascan management and one other Brascan shareholder. The following day, April 20, the Commission denied Edper's application because

4. Brascan argues that this observation prior to any announced resistance by Woolworth showed illicit communication and cooperation between Woolworth and Edper. This was not demonstrated. Edper inferred resistance from the publicly known fact that Woolworth had engaged a lawyer well known for resistance to tender offers.

of its conditional nature, and Edper issued a press release announcing that fact. In the release Edper "stressed it would continue to pursue other avenues to have the Woolworth acquisition abandoned" (Exhibit 17).

On April 20 and 23, key members of the Edper group met to consider what course of action Edper should then take. Numerous alternatives were discussed, including: the making of an unconditional offer; the making of a conditional offer in the United States, Great Britain or in the provinces of Canada (where regulatory approval was not required); the making of an unconditional offer with paper or other securities (that would have the same effect as a "Woolworth condition"); a stock exchange block offer in Canada, and private arrangements with Brascan shareholders. Purchases over the AMEX were briefly discussed but this alternative was not given prominence at that time. The group discussed the number and price of shares that would be involved in the possible courses of action open to it, various opinions were expressed, but no conclusions were reached. Also considered (though not listed on the agenda) was the possibility of Edper selling its Brascan shares. The Edper group considered whether it should prepare a press release explaining its present posture, and decided not to do so.

On April 23, Edper contacted Connacher to arrange a meeting the next morning. On April 24, and again on April 25, Connacher met with Price, McCutcheon and Cockwell. At these meetings, the Edper group discussed the various alternatives that were being considered, and told Connacher that they thought he might be able to provide assistance in connection with two alternatives—purchases on the American Stock Exchange and the making of a conditional offer for Brascan shares in the United States. In connection with possible purchases on the floor of the AMEX, Edper sought Connacher's advice on the selection of an American broker; the appropriate commission; dollar conversion; and currency hedging problems. The group discussed how many Brascan shares might be bought at various times and what the prices might

be. Connacher was asked if he would be available to go with Price to New York on April 29 to assist in either setting up the mechanics of purchasing over the AMEX if Edper decided to do so or to introduce Price to investment bankers in New York if Edper decided to make a conditional offer in the United States. There was no talk of compensation to Connacher. He 'was to perform these advisory services on a friendly unpaid basis. Edper informed Connacher that it was considering utilizing the firm of Balfour Securities in the event that it decided to purchase shares over the AMEX and asked Connacher to contact Jay Goldsmith, the President of Balfour, to see whether he would be available in New York the following week. An employee of Gordon Securities contacted Goldsmith for that limited purpose later that week.

Also on April 24, Edper investigated further the possibility of purchasing Brascan stock over the London Stock Exchange. On April 26 and 27, McCutcheon met with Ackroyd & Smithers, jobbers on the London Stock Exchange, to discuss the mechanics of purchasing over the London Stock Exchange and the availability of Brascan stock on that exchange.

Since the week of April 9, Edper had been pressuring Brascan's management, to no avail, to either meet with Edper to discuss the Woolworth offer or to call a shareholders' meeting. On April 24, Brascan's management informed its stockholders that the Brascan annual meeting, previously scheduled for May 23, 1979, would be deferred to June 26, 1979 or to an even later date. On the evening of April 29, 1979, after Connacher and Price had already left for New York, Messrs. Keenan, McCutcheon, Eyton, Cockwell and Bronfman met. Prior to the convening of the meeting, Edper had still not resolved which of the several available alternatives it was going to pursue and work had been continuing on a number of fronts up to that time. McCutcheon had been looking into purchases in London; Greenshields, a Canadian investment banker, had been talking on Edper's behalf to lawyers about a paper-type offer

in Canada free from tax problems; Edper's counsel was working on an unconditional offer; Edper's printers were printing an unconditional offer; Edper was talking to National Trust about getting a shareholders list in order to be able to send out a circular offer in Canada; and Edper was working with a mailing house to facilitate the mailing of a circular offer in Canada.

The initial purpose behind the meeting on April 29 was to provide an update for the group. However, various reports were made at the meeting which lent a sense of urgency to the situation. The Patino group reported rumors circulating in Europe about competing bids for Brascan. Noranda Mines was mentioned as a possible suitor through a defensive stock swap. The Patino board of directors had met on April 26 and 27, at the Hague and had resolved that more Brascan shares should be purchased.

In addition, Brascan had announced it was postponing its annual meeting and Moore had said that, if the Woolworth deal was aborted, he would pursue alternative proposals, which Edper construed to be further defensive measures.

The conclusion of the April 29 evening meeting was that Edper should acquire more shares in order to secure the 10% necessary under Canadian law to compel a shareholders' meeting, to have a greater impact upon Brascan management, and to obtain a better reception at the hearing of the New York Attorney General which was scheduled for May 10 to investigate Brascan's offer for Woolworth. The group discussed paying as high as $25 (Cdn.), per share. It was provisionally decided to buy shares the next day on the American Stock Exchange, subject to sleeping on it and reviewing the decision in the morning. No firm decision was made as to the amount of stock to be purchased. The group discussed issuing a press release, but decided that it would not do so unless required by a regulatory body.

At that meeting, McCutcheon was authorized to initiate purchases of up to 200,000 shares on the London Stock Exchange the next morning in line with the previous close on the American Stock Exchange. He did not think that a great number of shares would be available there. His instructions were to "go gently" and to "check back" if a great number of shares became available. Due to the difference in time zones, a decision to buy on the London Exchange could not wait until the morning of the following day. McCutcheon had to place his orders in the very early morning hours of April 30—Toronto time.

Price and Connacher flew to New York on April 29. Although nominally a vice-president of Edper, Price did not have decision making authority. Furthermore he had not been extensively involved in Edper's planning of its Brascan acquisitions. Price had some experience in stock market activity and was friendly with Connacher. Price was sent to New York to carry out Cockwell's instructions in negotiating terms with a broker, placing orders as directed, and setting up the mechanics of the transactions.

After checking in at the Waldorf, Price telephoned Goldsmith of Balfour Securities and arranged to meet with him the next morning for breakfast.

Shortly after the tentative decision to purchase on the American Stock Exchange was reached in Toronto, on April 29, Cockwell telephoned Price to inform him of the tentative decision and to tell him that a final decision would be made the next day. Price told this to Connacher.

*April 30*

At about 4:30 a. m. on April 30, McCutcheon placed an order with Ackroyd & Smithers to purchase 100,000 Brascan shares on The London Stock Exchange at up to $21 (U.S.), a price approximately equivalent to the closing price of Brascan stock on the American Stock Exchange the preceding Friday. By 9:00 a. m., 15,000 shares had been purchased. No further purchases were made that day on the London Exchange, pursuant to McCutcheon's

instructions that purchasing cease at 9:00 a. m. New York time.[5]

At 7:30 a. m. Cockwell instructed Price to proceed with the planned breakfast meeting with Goldsmith. Goldsmith met with Connacher and Price, and agreed, subject to confirmation with his clearing broker Becker, to handle purchases for Edper on the AMEX for a commission of five cents per share. Price informed Goldsmith that Edper was considering purchasing one million Brascan shares. Goldsmith told this to Becker and reported back approval to broker the deal at the agreed upon rate of commission.

After the breakfast meeting, Connacher and Price went to Gordon's offices in New York. At some time prior to the opening of the market, Connacher called Gordon's offices in Toronto to indicate that Balfour would be buying Brascan stock on the floor of the AMEX on behalf of Edper, but informed the personnel of Gordon not to discuss that with anyone.

Sometime after 9:00 a. m. Price was authorized by Cockwell to place an order with Balfour for one million shares of Brascan at the best price up to $25 (Cdn.) (21⅞ U.S.). Between 9:30 and 9:45 a. m., Price informed Connacher that he had a mandate to purchase up to one million shares. As the market opened, Price instructed Goldsmith to purchase Brascan stock at $21¼ (U.S.), and soon raised the bid to 21½. Balfour was able to purchase only approximately 28,000 shares at these prices. Price held his bid at 21½, and no more stock was available that morning.

Between 10:15 a. m. and 10:30 a. m. Price said to Connacher that if three million shares were available, he believed Edper might be willing to buy them at a premium. Connacher contacted large shareholders of Brascan who were clients of Gordon Securities and instructed Gordon personnel to do the same. Connacher and his salesmen contacted between 30 to 50 institutional shareholders and 10–15 individual shareholders of large blocks of Brascan shares. Total Brascan shareholders numbered more than 50,000.

The message conveyed by Connacher and the Gordon people to the large Brascan shareholders was a uniform one: that if 3 to 4 million shares were offered at $26 (Cdn.) ($22¾ U.S.), Edper might purchase them. Throughout April 30 and May 1, the Gordon people were careful to state that there was no assurance that the transaction would occur. There is no evidence that the shareholders contacted were told any time at which such a transaction would take place or any time limit within which they must reply. The shareholders contacted by Gordon were highly professional investors. A few large shareholders and investment bankers contacted Gordon on their own and were given the same message conveyed to other shareholders.

These findings concerning Connacher and Gordon Securities are applicable to both April 30 and May 1. In contacting shareholders on those days, Connacher and Gordon did not act at the instructions of, or as a representative of, Edper. To the contrary, Connacher and Gordon acted independently as a sellers' broker because it was in their financial interest to do so. It is true there was a good deal of communication between Connacher and Price, often in the nature of Connacher informing Price of the volume that was shaping up on the sell side. Such communication between buyers' and sellers' representatives is normal since it serves the mutual interest of all the parties in seeking to bring about a mutually advantageous transaction. Edper's managers and decision makers in Toronto, on the other hand, unlike Price, were quite unaware of Connacher's activities. While they no doubt assumed he would be doing a stockbroker's business and participating in this opportunity to earn lucrative commissions by soliciting sellers of Brascan shares, they had no communication with him and no awareness of his activities beyond the

---

5. The reason for this was to avoid Edper's effectively bidding against itself on two exchanges simultaneously.

advice as to mechanics he had volunteered to furnish to Price.

Shortly after noon on April 30 in Toronto, Cockwell heard further confirmation that Noranda Mines Ltd. and Brascan were planning to swap substantial shares of stock in a joint defensive move and that Noranda would go into the market to buy substantial shares of Brascan.

Edper decided to increase the size and price of Edper's bid to three million shares at $26 Cdn. (22¾ U.S.) or better. Price was so instructed.

Connacher told Price he believed approximately 1.5 million shares might be available if Edper placed an order at 22¾. At approximately 2:45 p. m. Price placed an order with Balfour for 2½ million Brascan shares at 22¾. Price told Connacher he had placed this order.

Balfour's floor representative found very little stock available below a price of 22⅝. He bought what there was at lower prices and increased the bid to 22¾ for over 2 million shares. Shortly after Balfour received Edper's buy order, Gordon, which by then had accumulated some two million shares for sale, approximately 1.7 million of which was available from its clients, placed an order to sell 2 million shares at 22¾.

At 3:08 Edper's broker Balfour purchased 2.4 million shares in one print at 22¾, of which 1.8 million came from Gordon, the rest from other brokers. Later that afternoon, Price instructed Balfour to buy 500,-000 more Brascan shares at 22¾ and Balfour did so.

By the close of the day on April 30, Edper had purchased a total of 3,104,800 Brascan shares on the AMEX. Of these shares, approximately 2,100,000 were sold by Gordon, for its own account or on behalf of its customers.

In the late afternoon, Edper representatives in Toronto received calls from the Ontario Securities Commission and the Toronto Stock Exchange requesting that Edper issue a press release and announce the amount of its purchases of Brascan shares. When the Edper group met later that after-noon, the consensus reached was that Edper had purchased more than enough shares to reach its immediate objectives of calling a shareholders' meeting, influencing Brascan's management and giving weight to its presentation at the New York Attorney General's hearing. The Edper group decided not to purchase any additional Brascan shares. Price was authorized to return to Toronto.

At 5:00 p. m. Edper issued a press release (Exhibit 31), announcing its purchases, its total holdings in Brascan shares and reiterating its determination to oppose Brascan's plan to acquire Woolworth. The release itself contained no reference to Edper's intention not to purchase additional Brascan shares.

Following issuance of this release, Eyton spoke to representatives of the Ontario Securities Commission and the Toronto Stock Exchange and told them Edper would not be making further purchases. Eyton also made the same comment in response to one or more inquiries from the press. On May 1 the Wall Street Journal reported:

"Edper said it doesn't currently plan to buy more Brascan shares." (Court Ex. 1).

*May 1*

McCutcheon had participated on April 30 in Edper's decision to raise the bidding price to 22¾. He left Edper's offices at 3:30 P.M. to go home and was unaware of the later decision to stop buying. Accordingly he rose once again shortly after 3:00 a. m. on Tuesday, May 1, and put in his order to London to buy up to 200,000 shares, this time at a price of $22¾ (U.S.) or better. His London brokers purchased and confirmed 132,200 at this price ·by 9:00 A.M. New York time, when his London buying ceased. McCutcheon did not learn of the previous evening's decision to stop buying until he arrived at Edper's offices around 9:30 a. m.

Edper's strategists met at 9:30 in Toronto to assess their position. Moore of Brascan had announced earlier that morning that Edper's April 30 purchases would not dissuade Brascan from proceeding to acquire

Woolworth. Patino was extremely unhappy with Edper's position. He expressed the view that Edper had incurred a tremendous risk without accomplishing anything. He urged additional buying. Price, who had returned to Toronto that morning, was advised by Connacher's call, that Connacher had additional customers interested in selling sizeable blocks at 22¾.

Edper decided to resume purchasing and to seek 1 million shares if they could be had at the previous day's prices. Price told Connacher Edper was interested in 1 million shares without exceeding 22¾.

Price gave Goldsmith an order to purchase Brascan shares at 22¼ or better. Very little was available. Price then put in a bid at 22½. By 11:45 Goldsmith had purchased approximately 110,000 shares of Brascan.

Connacher and members of his firm contacted their customers in the manner previously described and made purchases for Gordon's account on the floor of the Toronto Stock Exchange in an effort to accumulate more shares which Connacher hoped Edper would buy. Connacher advised Price that there was a lot of stock available. As the morning went on, the Edper group in Toronto decided to bid for as much as 3 million shares. Price placed an order with Balfour for two million shares at 22¾ or better. A few minutes later Goldsmith of Balfour advised Connacher by telephone that he had received an order to bid for two million shares.

By 12:15 p. m. Balfour had bought 2 million shares (900,000 of which were sold by Gordon). Soon thereafter, Edper gave Balfour an order to purchase an additional one million shares at 22¾ or better and later for another 250,000 shares.

Around 1:00 p. m. Goldsmith told Price that he would like to tell his floor trader to stop buying so he could get an accurate count of what he had purchased. Price agreed. After that time Edper made no further purchases. During the course of the trading that day Balfour purchased for Edper approximately 3,200,000 Brascan shares. Of this number approximately 1,550,000 were purchased from Gordon Securities or its customers.

Since 5:00 p. m. on the afternoon of May 1, Edper has been under a restraining order of this court prohibiting it from exercising stockholder's rights on any of its stock and prohibiting further purchases.

## CONCLUSIONS OF LAW

### I. Liability under Rule 10b–5.

Rule 10b–5, 17 C.F.R. § 240.10b–5, provides in relevant part, that it shall be unlawful "for any person, directly or indirectly, by the use of . . . any facility of any national securities exchange, . . . (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." Brascan argues that beginning in early April and in any event as early as April 20, 1979, Edper issued a series of confusing and misleading public statements, and failed to correct misleading impressions created by such public statements, with the result that the acquisitions of April 30 and May 1 on the American Stock Exchange were in violation of Rule 10b–5.

I find no basis for the charge with respect to Edper's conduct occurring prior to May 1, 1979. Edper's releases in early April correctly stated its position with respect to Brascan. On April 9 it announced an intention to consider making an offer for 11.7 million shares of Brascan at $28 a share. Hard on the heels of Edper's announcement, Brascan publicly announced on April 9 its intention to make a tender offer for all of the shares of Woolworth. Accordingly, the next day Edper issued a new release to the effect that it would have to reconsider its plans announced the prior day by reason of Brascan's aspirations to acquire Woolworth. Subsequently Edper announced its application to the Ontario Securities Commission to permit a conditional offer for Brascan's shares which would be

conditioned upon Brascan's not proceeding with the Woolworth acquisition. When the Ontario Securities Commission refused to permit such an offer to proceed because of its conditional nature, Edper announced the fact that the plan had not been approved and stated that it had "no specific plans at [that] moment to proceed further with an offering for Brascan shares." Edper went on to state that "it would continue to pursue other avenues to have the Woolworth acquisition abandoned" by Brascan, and in the April 20th as well as in earlier press releases made arguments to the effect that Brascan's acquisition of Woolworth was not in the best interests of Brascan's shareholders. Edper made no further public statements until the evening of April 30, 1979.

I find that none of the aforementioned statements made by Edper were in any way false, misleading or otherwise within the scope of Rule 10b–5. While they may have reflected changing positions, this was because they accurately documented Edper's changes of position in response to Brascan's offer for Woolworth and the actions of the Ontario Securities Commission. They were not confusing or misleading within the meaning of Rule 10b–5.

Brascan seeks to draw support from a memorandum apparently prepared on April 11, 1979. This memorandum captioned "Timing" was apparently prepared by an attorney associated with Eyton's law firm. The opening paragraph contains the following words "Press Release—April 10, 1979— desired reaction, market down". Brascan contends that these words document an intention on Edper's part to drive down the market in Brascan shares by its April 10 press release. Eyton, who was questioned about the document, testified that it meant something quite different. He said that the words "desired reaction" were words used in several instances in Edper's memoranda or publications and that they referred to the hope that Brascan's dissatisfied shareholders would pressure the management to abandon the Woolworth plan. The words "market down" simply referred to the fact that the market for Brascan shares was down and did not indicate any causal rela-

tionship between Edper's press release and the latter phenomenon. The item is somewhat confusing. Its author was not called as a witness. Brascan through this document has not sustained any burden of showing fraudulent or manipulative activity or intent.

Brascan also alleges that the agendas of several Edper meetings during April, showing as items for discussion the maintaining of periodic contact with representatives of Woolworth, showed that Edper was operating in an illicit and manipulative relationship with Woolworth. The proof showed the contrary. There were a few brief and innocuous contacts with Woolworth. These were rapidly terminated on advice of counsel. These items continued to appear on the meeting agendas apparently only because the preparer of the agendas made a practice of incorporating all items which had appeared on the previous agenda.

 Brascan argues that the public statement made on April 20 to the effect that Edper had no specific plans at that time to proceed with an offering for Brascan shares was either fraudulent and deceptive when made, or at least became so very soon when a specific plan was developed to acquire shares on the American Stock Exchange. This contention is unconvincing. It is my finding that those words on April 20 correctly represented Edper's position. Edper went on during the next ten days considering the possibility of a variety of alternative courses of action which were discussed at several successive meetings. The options being discussed included an unconditional offer in the event that the Woolworth plan should be abandoned, an offer including the Woolworth condition in the United States and the United Kingdom (this being the offer which had been prohibited in Toronto), an unconditional offer without the Woolworth condition "but providing paper or other securities with the same effect as the Woolworth condition", a Toronto stock exchange block offer, an offer on the American Stock Exchange, and private arrangements with shareholders. It

was not until April 29 that Edper's managers resolved a strong preference for an American Stock Exchange acquisition although this had been emerging as the preferred course during explorations of the various alternatives during the week. And it was not until the morning of April 30 that a firm intention was developed to plunge into large scale acquisitions over the American Stock Exchange. (In these, as in other findings, I rely in part on the testimony of Jack Cockwell, who I found to be a thoroughly credible witness and completely honest and forthright in his business dealings). I find no basis for the suggestion that any of the prior activity constituted a violation of Rule 10b–5.[6]

This brings us up to the events after the close of business on April 30 and during the day on May 1. During the trading day on April 30 Edper acquired more than 3 million shares of Brascan stock, mostly at a price of 22¾ $U.S. Edper's managers met together after the close on April 30 and decided that for the time being they had accomplished their near range objectives as explained above, and would purchase no more stock.

At that time Edper, at the request of the Ontario Securities Commission and the Toronto Stock Exchange, issued a press release (Exh. 31) concerning the day's acquisitions, breaking its silence of ten days. Later that evening Eyton received a telephone call from the Toronto Dow Jones representative and, in response to the journalist's questions, said that Edper had no intention to make further purchases. This representation was made in good faith and accurately represented Edper's intentions at that time.

Brascan argues that Edper's resumed purchases on the London Exchange which were ordered by McCutcheon at 4:30 A.M. Toronto time, together with Edper's resumed large scale buying on the American Stock Exchange on the following day, demonstrate that the late April 30 statement denying intention to acquire more stock was false and fraudulently designed to soften the market. The evidence does not support this contention. McCutcheon who was handling the London buying had been present in the Toronto offices during the afternoon of the 30th at the time when continued buying was authorized at stated prices. He left the office and went home around 3:30 and was not present or privy to the 5:00 P.M. decision to stop buying. He was also unaware until 9:30 the next morning of Eyton's public statement that no further buying would take place. McCutcheon arose at 3:00 a. m. to resume his purchases on the London Exchange in accordance with the strategy established the previous day which he did not know had been later countermanded.

Nor is there any justification for Brascan's attempt to attribute sinister and deceptive motives to the manner in which the London buying was carried out. McCutcheon's instructions, which he followed, were to "go easy" in London and not to bid aggressively, so as not to raise the price. He was also instructed to cease buying at 9:00 A.M. Brascan contends that the latter instruction was given so that the New York market would be unaware of the London buying. The argument is fanciful. For quite some time now communications technology has been sufficient to permit New Yorkers at the time of the opening of the

6. Brascan also argues that Edper was under a duty to make a public announcement of its intentions to purchase Brascan stock prior to its entering the market on April 30. Brascan offers no support for this contention. The cases that it relies upon, *SEC v. Shattuck Denn Mining Corp.*, 297 F.Supp. 470 (S.D.N.Y.1968), *Cochran v. Channing Corp.*, 211 F.Supp. 239 (S.D.N.Y.1963), and *Butler Aviation International, Inc. v. Comprehensive Designers, Inc.*, 307 F.Supp. 910 (S.D.N.Y.1969), aff'd, 425 F.2d 842 (2d Cir. 1970), are not on point in that they involved misleading or manipulative conduct.

More to the point is Judge Friendly's comment in *General Time Corp. v. Talley Industries, Inc.*, 403 F.2d 159, 164 (2d Cir. 1968), *cert. denied*, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969), that there is no rule of law that "a purchaser of stock, who was not an "insider" and had no fiduciary relation to a prospective seller, had any obligation to reveal circumstances that might raise a seller's demands and thus abort the sale." *See generally* Fleischer, Mundheim & Murphy, *An Initial Inquiry into the Responsibility to Disclose Market Information*, 121 U.Pa.L.Rev. 798 (1973).

market to be well aware of what happened in the London market during the previous six hours. .The reason McCutcheon was to stop buying at 9:00 New York time is simple and logical. Edper did not want to be bidding against itself.

█ The instructions to "go easy" in London do not have any of the sinister or manipulative character which Brascan seeks to attribute to them. They are the product of a normal, intelligent buying strategy. The London market was a thin market, meaning that there was not a large amount of Brascan stock to be acquired there. Aggressive buying or attempts to acquire large quantities in London would have driven the price of Brascan stock quite high without acquiring any significant amount of stock. Potential New York sellers on seeing the high London prices would then have been inclined to demand higher prices for their stock. There is as yet no law governing the securities markets which requires a buyer to handle his bids in a manner which will insure that he has to pay the highest possible price for what he wants to buy. *See General Time Corp. v. Talley Industries, Inc., supra,* at 164.

Nor does the large scale resumed purchasing on the American Stock Exchange on Tuesday, May 1, demonstrate falsity in the April 30 statement. Edper changed its mind on May 1 for three reasons. First, Moore, the Chairman of Brascan, made known that Brascan had every intention to pursue the Woolworth acquisition. Apparently Edper's April 30th buying had not been of sufficient size to deter the Brascan management. Second, Edper learned that there may be a substantial volume of additional stock available at the same price of $26 Cdn. ($22¾ U.S.) Third, Jaime Ortiz-Patino, a principal director of the Patino interests, upon his arrival in Toronto from Europe that morning, expressed great dissatisfaction with Edper's position because in his estimation Edper had exposed itself to tremendous risk by sinking a large amount of capital into the Brascan investment without having acquired a sufficiently substantial position to effectuate its policies. Pati-

no urged resumption of large scale buying and, particularly in view of the apparent availability of additional stock, and Brascan's intransigence, his partners agreed with him. Accordingly, Edper changed its mind and undertook another big day's buying. No consideration was given to issuing any further press release.

Edper then proceeded on May 1 to buy another three million shares mostly at 22¾, which had been the prevailing price of the day before.

█ Having undertaken to announce publicly its massive acquisition of April 30, and its intention to make no further purchases, I believe that Edper's resumption of large scale acquisitions on May 1 without announcing to the public a change from its so recently announced intentions could constitute an omission "to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . ." under Rule 10b–5. The April 30 statement denying further acquisition intentions could have the effect of making Brascan shareholders feel that they had missed their chance to sell at the best prices and make them eager to dispose of their stock before the price fell any further. Given the circumstances, the April 30 statement became "misleading" on May 1 when Edper's intentions changed and a further statement was "necessary in order to make the statements made . . . not misleading." Edper omitted to make such further statements. Given the importance of the volume of Edper's buying, the issue of its intentions was "a material fact". *See TSC Industries v. Northway Industries, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Joyce v. Joyce Beverages, Inc.,* 571 F.2d 703, 707 n. 6 (2 Cir. 1978). Accordingly, the elements which appear on the face of Rule 10b–5 have been made out.

This leads to the question of scienter. I find that Edper's omission occurred with knowledge, but not with any intention to defraud or deceive. Edper was of course aware that it had made the April 30 statement. It was also aware that it undertook

to buy on May 1. Had its managers thought about the question they would have been aware that the actions of May 1 were in conflict with the statement of April 30 and that these circumstances might result in making the Brascan stock cheaper. I note in passing that with respect to the May 1 London purchases there was not even awareness on McCutcheon's part of the prior statement or its conflict with his May 1 actions.

Despite the knowledge that Edper did have or should have had concerning this misleading statement, I do not find that the omission on May 1 was motivated by any desire to deceive the public or to manipulate the condition of the stock market. How Edper would have dealt with the problem, had it confronted it specifically, is difficult to guess. It was eager to avoid making public statements of any kind during its program of stock exchange acquisitions, and it made the April 30 statement only because requested to do so by the officials of the Ontario Securities Commission and the Toronto Stock Exchange. In the statement of intentions informally given to a Dow Jones reporter, Eyton had gone beyond the authorized press release which had been discussed at the late afternoon meeting. I do find that throughout the events which were the subject of the hearing Edper's managers conducted themselves scrupulously, fairly and with good faith efforts to observe the requirements of law. I believe these observations are applicable to Edper's state of mind in its omission to correct the April 30 statement.

This raises the troublesome issue, what degree of scienter is necessary to justify an action for an injunction under Rule 10b–5 where the effect of the injunction would be to protect the stockholding public from the further effect of a misleading statement. There is clear law to the effect that a damage action under Rule 10b–5 will not lie

in the absence of proof of scienter—which the Supreme Court defined in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), as a "mental state embracing intent to deceive, manipulate or defraud," *id.* at 193, n. 12, 96 S.Ct. 1381, n. 12, and as "knowing or intentional misconduct," *id.* at 197, 96 S.Ct. 1375.[7] It has also been held recently in this Circuit that fraudulent intent is not necessary where injunctive relief is sought by the Securities Exchange Commission.[8] What is not clear is the question whether and to what extent scienter is required when injunctive relief is sought by a private party to prevent future harm from the misleading statement.

■ I need not reach definitive resolution of that issue at this stage of a motion for a preliminary injunction. For under the second branch of the *Sonesta International Hotel's* test,[9] all that is needed, together with other factors discussed below, is a "sufficiently serious questions going to the merits" to make it a fair ground for litigation and a "balance of hardships tipping decidedly toward the party requesting the preliminary relief" together with irreparable harm. I find that that test is narrowly met under these circumstances and that a tipping of the equities may well justify some form of injunctive relief designed to protect Brascan shareholders from the possibility of being misled by the continuing effect of the April 30 statement.

II. *Liability under the Williams Act.*

A. The filing requirements of Section 13(d) and 14(d).

■ Brascan's first contention with respect to the Williams Act is that Edper, from the time it had acquired more than 5% of the stock of Brascan in the early part of 1979, was in violation of § 13(d) of the Exchange Act by virtue of its failure to file

---

7. *See also, Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978); *Lanza v. Drexel & Co.,* 479 F.2d 1277 (2d Cir. 1973); *Shemtob v. Shearson, Hammill & Co.,* 448 F.2d 442 (2d Cir. 1971).

8. *See SEC v. Aaron,* 605 F.2d 612 [Current] CCH Fed.Sec.L.Rep. ¶ 96,800 (2d Cir. 1979).

9. *Sonesta Int'l. Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973).

statements required therein, and that this violation was compounded by Edper's failure to file the statements required by § 14(d) before making its purchases on April 30 and May 1. This contention requires little discussion. Sections 13(d) and 14(d) are not applicable to all securities but apply only to the equity securities of companies which are registered pursuant to § 12 of the Exchange Act. Brascan's shares are not registered pursuant to § 12. Brascan is a foreign issuer whose securities are not listed on any national securities exchange in the United States. Its shares are admitted to unlisted trading privileges on the American Stock Exchange, and are exempt from Section 12(g) under the provisions of Rule 12g3–2. The SEC appearing as amicus at the preliminary injunction hearing confirmed that the provisions of §§ 13(d) and 14(d) were not applicable to Brascan's shares. Rule 12f–4 does not, as plaintiffs argue, mandate a different conclusion.

B. The anti-fraud provisions of Section 14(e) of the Exchange Act.

The anti-fraud provisions of Section 14(e) are drawn in terms virtually identical to those of Rule 10b–5, but the two rules operate in different contexts. Rule 10b–5 applies if the prohibited conduct occurs "in connection with the purchase or sale of any security"; Section 14(e) applies if the conduct occurs "in connection with any tender offer . . . ."

Accordingly, the omission on May 1 to correct the misleading impression created by the April 30 announcement which was found arguably violative of Rule 10b–5 might also have violated Section 14(e) if Edper's buying on April 30 and May 1 constituted a tender offer. Since the purposes of the Williams Act differ from those of Rule 10b–5, it is possible that upon a finding of a violation of Section 14(e), a different scope of remedial relief might be available than that appropriate under Rule 10b–5. Accordingly, the question must be considered.

■ I find that Edper's conduct did not constitute a tender offer within the meaning of the Williams Act.

In fact, Edper's conduct had very little similarity to what is commonly understood as a tender offer and what was described as a tender offer in the context of the hearings leading to the passage of the Williams Act. Edper did not engage in widespread solicitation of stockholders. Indeed, it scrupulously avoided any solicitation upon the advice of its lawyers. Its purchasing was not contingent on a minimum fixed number of shares being offered, it did not put out an offer at a fixed price and the form of the transaction did not provide for tenders by the selling shareholders to be held for some period of time by the purchaser or a depositary, as is customary in tender offers. What Edper did was to acquire a large amount of stock in open market purchases, bidding cautiously so as to avoid bidding up the price of the stock to excessive levels unless there was large volume available at such prices. This is not a tender offer, even if a large volume of stock is accumulated in such fashion. *See Kennecott Copper Corp. v. Curtiss Wright Corp.,* 584 F.2d 1195, 1206 (2d Cir. 1978).

Brascan argues that Edper made Connacher its agent so that all of Connacher's and his firm's activity in lining up potential sellers is attributable to Edper in determining whether or not Edper engaged in a tender offer. I do not find this contention supported by the evidence. It is true without question that Connacher had some connection with Edper and assisted Edper in certain respects. A week prior to Edper's large market acquisitions, it had consulted Connacher (because he was known to be well informed concerning Brascan stock), as to his opinion of the feasibility of acquiring a large number of Brascan shares. Indeed, earlier in January and February it had employed Connacher as a broker in acquiring blocks of Brascan stock. On April 29 and 30, Edper obtained Connacher's assistance in setting up the mechanics for American Stock Exchange transactions. He helped Price negotiate a brokerage commission with Balfour, and he advised Price as to

how to handle questions of foreign currency exchange, hedging and mechanisms for making payment in connection with large purchases. He was prepared to introduce Price to New York investment bankers in the event that Edper chose a route other than open market purchases. But in his solicitation of customers who might be interested in selling, he was simply not acting at the instructions of, or in any way as agent for, Edper.

■ Of course Connacher and Edper necessarily had interests in common. A seller's broker always has interests in common with the buyer. If the buyer does not buy, the seller's broker will not earn his commission. Thus, if Connacher as a seller's broker were capable of rounding up a large volume of shares for sale at a price that Edper was willing to pay, Edper's objectives would be satisfied and Connacher would make money. That did not make Connacher Edper's agent for the solicitation of sellers' shares.

Even if Connacher were deemed to have been Edper's agent in the solicitation of shares for sale, still the transaction would not constitute a tender offer within the meaning of the Williams Act. All that Connacher and his firm did was to scout between 30 and 50 large institutional holders of Brascan stock, plus about a dozen large individual investors, to collect a large block for Edper to purchase at a price agreeable to both sides of the transaction. He and his firm did this in the conventional methods of privately negotiated block trades. Such privately negotiated block trading is done on a daily basis in the U.S. securities markets without anyone's ever suspecting that what is being practiced might be a tender offer. In the recent *Kennecott* case, *supra*, this Circuit refused to construe tender offers under the Williams Act as covering this sort of conduct.

A small number of District Court cases [11] have held that the Williams Act should be deemed applicable to such large scale accu-

mulations. The general thrust of the reasoning is that since the Williams Act was designed to remedy certain problems often found in tender offers, and since similar problems are to be found in other forms of stock accumulation, the Williams Act should be deemed to cover such other forms of stock accumulation even though they are not what is conventionally understood as a tender offer.

There are serious problems with this form of statutory interpretation. First of all the legislative history of the Williams Act shows that it was passed with full awareness of the difference between tender offers and other forms of large scale stock accumulations. Statements by Senator Williams, the proponent of the bill and by SEC Chairman Manuel Cohen at the legislative hearings specifically advert to the fact that tender offers are distinguishable from other forms of large scale stock accumulation including privately negotiated transactions.[12] Indeed, the provisions of the Williams Act itself acknowledge those distinctions since it provides for different consequences where an initial accumulation is acquired by tender offer as opposed to where it is acquired by other methods. There can be no question that Congress regulated what it wished to regulate and chose not to regulate what it did not wish to regulate.

Further the regulatory scheme established by Congress in the Williams Act is incompatible with its application to a program of market purchasing. As the Court of Appeals pointed out in the *Kennecott* case, the provisions of Sections 14(d)(5), 14(d)(6) and 14(d)(7) are unworkable when applied to a program of acquisition which includes stock market purchases. (See also Rule 10b–13.) The consequence of bringing such large scale open market and privately negotiated purchases within the scope of the Williams Act would be to rule, in effect, that no large scale acquisition program may

---

11. *See S–G Securities, Inc. v. Fuqua Investment Co.*, 466 F.Supp. 1114 (D.Mass.1978); *Cattlemen's Investment Co. v. Fears*, 343 F.Supp. 1248 (W.D.Okla.1972).

12. *See* 113 Cong.Rec. at 854–6 and *Hearings on S. 510 Before Sub-Comm. on Securities of Senate Comm. on Banking and Currency*, 90th Cong., 1st Sess. at 16, 17, 24–25, 36 (1967).

be lawfully accomplished except in the manner of a conventional tender offer. While this may be a sensible legislative provision (and may be implicit in the 35 offerees formulation set forth in the ALI's proposed Federal Securities Code, *see* Section 299.68) there is nothing in the legislative history or the text of the Williams Act which suggests that it intended to bring about such consequences.

The Securities Exchange Commission, at this Court's request, submitted a brief *amicus curiae*. The Commission takes no position as to whether the acts of Edper constituted a tender offer, but lists eight factors which authorities have considered in determining whether acquisitions constitute a tender offer under the Williams Act.[13] The SEC refrains from specifying which of the eight factors or how many must be met or how clearly before an acquisition will be considered a tender offer. I have doubts as to whether this view constitutes either a permissible or a desirable interpretation of the statute. As to permissibility, I have some question whether it expands the scope of the statute beyond what Congress can reasonably be understood to have intended, depending how many and which factors are deemed necessary. I believe it is not desirable because the application of so vague a test would introduce a crippling uncertainty in an area in which practitioners should be entitled to be guided by reasonably clear rules of the road. The consequences of having purchased on the open market where a court would later determine on the basis of so unpredictable a test that the provisions of Section 14(d) should have been respected could well be catastrophic beyond reason. Since purchasers could not reasonably assume such open-ended risks, the practical consequence of adopting such an interpretation would be that large scale ac-

quisitions can only be accomplished by the method of conventional tender offers and, as noted above, this is not a permissible reading of the Williams Act.

But more important for purposes of this decision, I find that even if the Commission's eight criteria represented the authorized interpretation of the Williams Act, Edper's actions, even as supplemented by Connacher's, do not sufficiently meet these criteria to come within the definition of a tender offer.

The first criterion calling for "active and widespread solicitation of public shareholders" is clearly not met. The solicitations were directed to only approximately 50 of Brascan's 50,000 shareholders, each of the 50 being either an institution or a sophisticated individual holder of large blocks of Brascan shares.

The third criterion calling for "a premium over the prevailing market price" is met, but only to a slight degree. Edper was unable to purchase large amounts at 21½. Its broker, Balfour, did not encounter sizeable blocks until it went as high as 22⅜. The price at which it accomplished its major volume, 22¾, was only ⅜ of a point above what any purchaser would have had to pay for any significant volume.

Criterion number four that "the terms of the offer are firm rather than negotiable" was not met. Edper, Gordon, and the sellers were feeling their way to find a level at which large volume purchasing could be done. The fact that Gordon spoke to potential sellers during the morning of the likelihood of a price of $26 Cdn. (22¾ U.S.) did not represent a firm bid. I find that it represented Connacher's well educated guess as to where a deal might be put together based on his knowledge of the

---

**13.** The eight factors are as follows:

(1) "active and widespread solicitation of public shareholders. . . ."

(2) solicitation is "for a substantial percentage of the issuer's stock."

(3) offer to purchase is "at a premium. . ."

(4) terms of offer "firm rather than negotiable."

(5) offer "contingent on the tender of a fixed minimum number of shares. . . ."

(6) offer is "open for only a limited period of time."

(7) offerees "subjected to pressure to sell their stock."

(8) "public announcements of a purchasing program . . . precede or accompany a *rapid accumulation*. . . ."

market and of the buyer's and sellers' desires. He and his traders repeatedly denied to their customers the existence of any firm bid.

The fifth criterion, "whether the offer is contingent on the tender of a fixed minimum number of shares" is met only to a slight degree. It is true that Edper was not interested in bidding up the price too high without acquiring a large number of shares in doing so. And it is true that Connacher advised his customers that he didn't believe a transaction would go through unless sufficient volume were achieved. But these conditions were general, fluid and negotiable. They were not fixed as part of the terms of any offer to purchase shares.

The sixth condition, "whether the offer is open only for a limited period of time" is not met. Since there was no open offer, there was certainly no assurance that any offer would remain open for any period of time. Nor was there any statement to the effect that an offer temporarily available would soon disappear. What was said to the potential sellers by Gordon was that a buyer was interested in accumulating a large volume. Thus the situation did not carry with it the kind of potential pressure which, coupling a high premium with the threat that the offer will disappear as of a certain time, places an offeree under pressure to decide. That is the kind of pressure which the Williams Act was designed to alleviate, by providing information on which to base a decision. That was not present here.

I find that the seventh criterion, "whether the offerees are subjected to pressure to sell their stock" was not met. The offerees were experienced professionals, in most cases institutional portfolio managers. Even assuming that such professional investors can be susceptible to "pressure" in the sense in which the Williams Act is concerned, no such pressures were applied.

Finally, the eighth criterion, "whether public announcements of a purchasing program . . . precede or accompany a rapid accumulation" was not met. Edper had made some public announcements in early April when it was contemplating differently structured programs of acquisition. It announced its application on April 18 to the Ontario Securities Commission for permission to make a conditional circular offering. When permission was refused on April 20, Edper announced the refusal to the public and indicated that it had no specific further plans at that time. No further public statement was made by Edper until the close of business on April 30.

In short, the only one of the SEC's eight criteria which is clearly and solidly met is number two, that "the solicitation is made for a substantial percentage of the issuer's stock." While one might have no disagreement with legislation which imposed pre-acquisition disclosure requirements, comparable to those required by § 13(d), whenever a purchaser intended to acquire by any means a large specified percentage of any publicly held stock, that is not what the Williams Act now requires. It is not in my view within the power of a court to so rewrite its provisions.

### III. *The Scope of Relief.*

Having found a single instance of unintentional misleading of shareholders, resulting from a failure to correct a prior statement which changed intentions could have rendered deceptive, it remains to consider the appropriate scope of relief under Rule 10b–5.

Brascan has shown no injury to itself and no entitlement to injunctive relief for its protection (as opposed to the protection of its shareholders). The justification for permitting Brascan, the issuer, to maintain this action is that the issuer was in the best position to protect the interests of its shareholders from further deception. It is the interest of the shareholders which the injunctive relief may properly protect, at least in the absence of a showing that the issuer has been harmed by the violation of Rule 10b–5. *See Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937 at 947–48 (2d Cir. 1969).

As to the shareholders, no violation or injury of any kind has been shown with respect to sellers of stock acquired by Edper prior to the close of business on April 30. Accordingly, there is no warrant for the grant of any injunctive relief against Edper concerning its exercise of full shareholders' rights as to those shares. As to stock acquired on May 1, the omission to correct the statement of April 30 might have resulted in bringing a lower price to the selling shareholders of May 1. If so, their only injury is monetary. The continuation of an injunction against Edper prohibiting its exercise of ownership rights over those shares acquired on May 1 would in no way cure any harm which might have been suffered by the May 1 selling stockholders. A correction of the misleading aspect of the statement, would not have induced selling shareholders to hold on to their stock so as to preserve their voting rights. And, in any event, since May 1, Brascan stock has actively traded well below the May 1 market price. From this, it can be inferred that there are no Brascan shareholders who were prevented by higher market prices from reconstituting the position they had before they sold on May 1. The open market has offered them better relief than rescission. Accordingly, I can find no basis in Edper's May 1 omission for the grant of injunctive relief which would restrict Edper's rights of ownership as to the May 1 stock. If May 1 sellers were injured in the price they received, they can seek compensation by a damage action, *see Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), assuming they would be able to prevail in showing the necessary scienter (which I have not found). Whether or not they can prevail in such a damage action, their position would in no way be improved by the grant of injunctive relief against Edper.

The next class to be considered is the remaining shareholders of Brascan (the potential offerees of any further bidding), and the general investing public. In retrospect it is in their interest alone that the injunctive relief granted on May 1 was justified. The proper purpose of injunctive relief in this situation is only to protect the marketplace and the holders of Brascan stock from further deception as a result of the failure to correct the April 30 statement. Holders of Brascan stock after May 1 might well have been deceived as to the value of their stock by reason of their incorrect belief that Edper had withdrawn from the market. Their protection does not require that Edper be barred from making further acquisition of Brascan stock. The balance of the equities requires only that Edper set the record straight and disabuse the shareholders of the misleading effects of the April 30 statement before doing so. *See Sonesta Hotels, supra.*

Given the innocent nature of the misleading, Edper's undoubted willingness to make the appropriate corrections and the ease and speed with which this can be accomplished, I find no basis for granting any injunctive relief.[14] The preliminary injunction is therefore denied. And the temporary restraining order of May 1 is hereby dissolved, with exception of the provision forbidding further purchases, which shall be dissolved promptly upon Edper's application demonstrating that it has made a public statement, correcting any misleading impression which may remain from the statement of April 30.

One final observation is appropriate. In *Talley Industries, supra,* Judge Friendly noted that in allowing a corporation to enjoin "manipulation of its stock, . . . courts must act both with speed and with caution lest such actions become vehicles for management to thwart" events which may be in the true interests of the stockholders. In this case Brascan's management obtained an *ex parte* temporary restraining order which deprived its 30% shareholder of the exercise of shareholders'

14. At the hearing I declined to receive in evidence two affidavits, Exhibits 44 and 45. I have considered their contents and find that, even had they been received, they would not have affected my decisions in any way.

rights. The order has remained in effect for nearly a month by reason of Brascan's allegations of pervasive fraud which it now appears were without foundation. A principal purpose in Edper's increasing its shareholdings on April 30 was to be able to oblige Brascan's management to call a stockholders' meeting at which holders of Brascan stock would be able to vote on the desirability of the Woolworth acquisition. Management had not only refused Edper's earlier request for a shareholders' meeting, but had gone further and postponed the previously scheduled annual meeting.

Edper, furthermore, contends that it may have been irreparably harmed by the duration of its disfranchisement. It has made an enormous investment in Brascan. It contends that the value of its investment will be seriously diminished if Brascan proceeds with the Woolworth acquisition, and that it has been unjustifiably prevented from exercising its stockholder's right to vote on the matter. Without expressing any opinion of any kind on the desirability of the Woolworth acquisition for Brascan, I am strongly of the view that Brascan's shareholders should not be precluded by management from expressing themselves on so important a question. If, after the lifting of this restraining order, Edper, as a 10% holder, proceeds to make its demand for a shareholders' meeting, I would think it incumbent on management not to oppose, obstruct or delay the convening of such a meeting.

SO ORDERED: