**UNIVERSITY BANK AND TRUST COMPANY, Plaintiff,**

v.

**Sumner GLADSTONE, Defendant.**

**Civ. A. No. 83–3021–C.**

United States District Court,
D. Massachusetts.

Nov. 21, 1983.

Lawrence G. Cetrulo, James F. Kavanaugh, Burns & Levinson, Boston, Mass., for plaintiff.

Edward T. Robinson, Gaston Snow & Ely Bartlett, Boston, Mass., for defendant.

## MEMORANDUM

CAFFREY, Chief Judge.

This is a civil action alleging violations of Sections 13(d), 14(d), and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("Act"), and violations of the Racketeer Influenced and Corrupt Organizations Statute ("RICO"), 18 U.S.C. §§ 1961–1968. The case is before the Court on plaintiff's motion for preliminary injunction. The parties have submitted the matter for determination on the basis of oral arguments and memoranda of law.

The plaintiff, University Bank and Trust Company ("the Bank"), alleges that the defendant, Sumner Gladstone ("Gladstone"), violated the Act and RICO in September 1983 by his solicitation and purchase of options on certain Bank securities. The Bank is a publicly owned corporation with 395,360 shares of common stock issued and outstanding. As of December 1981, Gladstone owned a beneficial interest in 65,667 shares of the Bank's common stock. On June 22, 1982, Gladstone was issued 200 shares of directors' qualifying stock. In December 1982, Gladstone purchased voting trust certificates issued pursuant to an existing voting trust agreement representing 1,200 shares of common stock of the Bank. On July 8, 1983, Gladstone purchased 7,900 shares of stock, as well as options to purchase an additional 2,000 shares. As a result, by mid-July 1983, Gladstone owned 76,967 shares, or approximately 19.4% of the Bank's common stock.[1]

Sometime in August 1983, Gladstone prepared a proposed shareholders' agreement, dated September 1, 1983. Under its terms, shareholders would "agree to associate [them]selves for the purpose of acquiring

---

1. For purposes of this motion, I include in Gladstone's total number of shares options to purchase Bank stock and voting trust certificates held by Gladstone.

the control and management of [the] Bank." The record contains no evidence that Gladstone ever distributed the proposed agreement.

In September 1983, Gladstone retained George Cain as his agent to solicit options to purchase shares in the Bank. The Bank asserts that at that time Gladstone "began an aggressive and organized campaign to take over control of the bank." Gladstone, in contrast, characterizes his actions as an "attempt to determine whether there was sufficient interest by stockholders of the bank to sell their shares at [a premium]," because, if there was, he intended to make a formal tender offer. Cain, on Gladstone's behalf, solicited as many as 49 of the Bank's approximately 650 shareholders, representing roughly 22% of the issued and outstanding shares of stock. Affidavits filed by the parties show that Cain solicited shares by approaching the shareholder, identifying himself as Gladstone's agent, and offering to purchase options on all of the shareholder's stock.[2] The option was priced at $5.00 per share and was exercisable at $18.00 per share on or before February 28, 1984. Through Cain, Gladstone acquired options on an additional 15,410 shares. Cain ceased all solicitations on Gladstone's behalf on October 6, 1983.

The Bank claims that Gladstone had formed the intent to take over control of the Bank prior to the September 1983 solicitations. The Bank has submitted the affidavit of John J. Nyhan, President, Chairman of the Board, and a major shareholder of the Bank, who claims that on several occasions during 1981, 1982 and 1983, Gladstone told him and other shareholders that he wanted to obtain control of the Bank. Nyhan also states in his affidavit that during 1982 and 1983 Gladstone attempted to purchase Nyhan's substantial interest in

the Bank, as well as the interest of another major stockholder, William Walsh.

At the time of the September solicitations, Gladstone's F–11 filings, required by § 13(d) of the Act, did not include a statement that he intended to take over the Bank. On October 13, 1983—eight days after he was served with the complaint and summons in this action, and seven days after he claims to have instructed Cain to stop his solicitations—Gladstone filed Amendment 5 to his Form F–11 stating his intent to take over the Bank.

The Bank alleges that Gladstone has violated § 13(d) of the Act by his false and misleading statements in his original Form F–11 and subsequent amendments, including Amendment 5 filed October 13, 1983. In addition, the Bank alleges that Gladstone's "public and aggressive purchasing program" conducted in September and ending October 6 constituted a "tender offer" within the meaning of the Act, and that Gladstone violated §§ 14(d) and (e) of the Exchange Act by failing to make proper tender offer filings. The Bank also alleges that Gladstone's §§ 13(d), 14(d) and 14(e) violations constituted a "pattern of racketeering activities" as defined in and proscribed by RICO. The Bank requests that this Court issue a preliminary injunction restraining Gladstone from directly or indirectly (1) acquiring any shares or options to purchase shares of the Bank's common stock; (2) making a tender offer; (3) selling any shares; (4) exercising any options to purchase shares; (5) voting in person or by proxy any shares; (6) soliciting any proxy with respect to Bank securities; (7) otherwise using any shares of the Bank's stock as a means to control or affect the management of the Bank; and (8) taking any other steps in furtherance of an unlawful plan to purchase shares of the Bank's stock.

---

**2.** The options are conditional. They cannot be exercised unless (1) the Federal Deposit Insurance Corporation has approved the acquisition under the Change in Bank Control Act of 1978, and Gladstone has complied with Massachusetts General Laws Chapter 110C, if applicable; or (2) the Board of Governors of the Federal Reserve System has approved the acquisition as a result of the exercise of the option by a "Company" as defined by the Bank Holding Company Act of 1956, and the Company has received all other necessary state and federal government approvals.

To obtain a preliminary injunction, a plaintiff must establish

> (1) that [it] will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that [it is likely to succeed] on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981) (citation omitted). Because plaintiff has failed to make the requisite showing herein, I rule that plaintiff's motion for preliminary injunction should be denied.

### The Bank's § 13(d) Claims

Section 13(d) and accompanying rules and regulations require any person who becomes owner of five percent or more of any class of equity securities of a public bank to file a Form F–11 with the Federal Deposit Insurance Corporation ("F.D.I.C."). 12 C.F.R. §§ 335.401 *et seq.* The owner must later amend the filing to reflect any material change in facts contained in his earlier filing, including any material increase in the percentage of bank shares he owns. *Id.* § 335.402. The owner must disclose in his Form F–11, among other things, his identity and background, the nature and extent of his interest in the bank, his purpose in purchasing the securities, and any proposals he might have with respect to the securities, the bank's corporate structure, assets, capitalization, dividend policy or business. *Id.* § 335.407.

The Bank argues that Gladstone's current F–11 is still materially misleading, and that the Court should enjoin Gladstone from acquiring any more shares until he amends it. Gladstone's Form F–11, Amendment 5, filed on October 13, 1983, states that his

> intentions with respect to the purchase of the September Options was [sic] to attempt to determine whether there was sufficient interest by stockholders of the Bank to sell their shares at $18 per share and, if there was, to make a formal

tender offer under Massachusetts General Laws Chapter 110C ("Chapter 110C"), if applicable ... Mr. Gladstone has no plans or intentions to exercise the September Options without complying with ... Chapter 110C ....

Chapter 110C requires any individual who makes a "takeover bid" to announce the takeover bid publicly, to make numerous filings with the secretary of state and the target company, and to pay a $1,000 filing fee. The statute defines a "takeover bid" to include any "acquisition ... by the accumulation of stock in the market" of ten percent or more of any class of equity securities of a target company. Mass.G.L. ch. 110C, § 1. A bidder is considered the beneficial owner of securities he has the right to acquire through the exercise of presently exercisable options. *Id.*

The Bank contends that Gladstone had already made a takeover bid prior to September 1983 because he had accumulated greater than ten percent of outstanding Bank securities. Gladstone had not made any Chapter 110C filings, and was thus, according to the Bank, already in violation of Chapter 110C by the time he filed Amendment 5. The Bank concludes that Gladstone's statement in Amendment 5 that he *will* comply with Chapter 110C if he should make a takeover bid is "obviously false and misleading" because it "represent[s] to the investing public he will follow Chapter 110C law when his actions have conclusively established that he has already violated the [sic] Chapter 110C."

█ Even if that representation is in fact misleading, the Bank has not shown that a shareholder would rely on it to his detriment in deciding whether to sell his shares. Normally, if an offeror failed to file under Chapter 110C, he might mislead stockholders to believe he owns less than 10% of the target's stock, making them less likely to recognize his solicitation as part of an attempt to gain control of the company. But in this case, Gladstone's F–11 filings state explicitly the number of Bank shares he owns—more, in fact, than 10%. Moreover,

Gladstone has already made public essentially all the information required by Chapter 110C in his F–11 filings. In short, the Bank has not shown that, unless this Court issues a preliminary injunction against further stock acquisitions by Gladstone, a stockholder or the Bank would suffer irreparable harm on account of Gladstone's statements regarding Chapter 110C.

The parties agree that, apart from its references to Chapter 110C, Gladstone's F–11 is no longer misleading. Even so, the Bank seeks to enjoin Gladstone from voting or selling his Bank securities because Amendment 5

> did not cure his Section 13(d) violation. The injury to shareholders who had been deceived by Gladstone into selling the Bank stock at a suppressed price had already been inflicted. As a result, Gladstone is closer, to acquiring control of the Bank, and thus, the Bank may become subject to irreversible changes in and decisions regarding its operations if Gladstone is permitted to vote those shares which were acquired in violation of Section 13(d). To permit Gladstone's "after the fact" filing to remedy the Section 13(d) violation would amount to a mockery of the statute's clear purpose in protecting the investing public from individuals who prey upon corporations and their shareholders by purchasing stock without complying with the statutory disclosure requirements. (Emphasis in original).

■ A preliminary injunction, however, is not the appropriate remedy for that type of "injury." First, the Supreme Court has made clear that for shareholders who have already sold their shares to Gladstone, the proper remedy is an action for damages, not an injunction. *Rondeau v. Mosinee*

*Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975).

■ An injunction is also inappropriate in this case to protect the interests of remaining Bank shareholders who did not sell to Gladstone. Gladstone does not yet control the Bank. Bank shareholders other than Gladstone are still in a position to vote their shares and to exercise all other rights of stock ownership. Gladstone has announced his intent to make a tender offer in the future, but only after he is able to gain government approval of the tender offer. There is no showing that a takeover battle is imminent. "[A]bsent an imminent contest for control, the fact that existing stockholders retained the benefit of their stock [makes] the possibility of damage to them remote at best." *General Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir.1977). Now that Gladstone has cured the deficiencies in his F–11 filing, shareholders are free to vote, sell, or retain their shares much the same as before, but now with full information. On the record here, there is no likelihood that the Bank's shareholders will be disadvantaged should Gladstone make a tender offer, or that the Bank will be unable to adequately place its case before them should a contest for control develop. *See Rondeau v. Mosinee Paper Co.*, 422 U.S. at 59, 95 S.Ct. at 2076. Accordingly, the motion for preliminary injunction to prevent Gladstone from voting, selling, or otherwise disposing of shares he is alleged to have obtained in violation of § 13(d) should be denied.

### *The Bank's § 14 Claims*

■ The Bank alleges that Gladstone violated §§ 14(d) and (e) of the Act which regulate tender offers. Section 14 does not define the term "tender offer." Courts have extended the statute to cover not only conventional, formal, public tender offers,[3]

---

**3.** "In conventional tender offers the offeror typically offers to purchase all or a portion of a company's shares at a premium price, the offer to remain open for a limited time. Frequently, the obligation to purchase on the part of the offeror is conditioned on the aggregate number of shares tendered: if more than a certain number are tendered, the offeror need not purchase

the excess; if less than a certain number are tendered, the offeror need not purchase any. The shareholder responding to the offer generally must relinquish control of the shares he desires to tender until the response of others is determined. (Citations omitted)."

*S–G Securities, Inc. v. Fuqua Inv. Co.*, 466 F.Supp. 1114, 1125 n. 6 (D.Mass.1978); *quoting*

but less conventional, private offers as well. The court in *Ludlow Corp. v. Tyco Laboratories, Inc.,* 529 F.Supp. 62 (D.Mass.1981), identified a number of tests for determining whether a purchasing program constitutes a tender offer. I rule that it is unlikely the Bank will be able to show Gladstone's solicitation of options constituted a tender offer under any of the tests set out in *Ludlow* because the record contains little evidence to show the solicitation was likely to force a shareholder into making a hurried investment decision without access to information. *See S–G Securities, Inc. v. Fuqua Investment Co.,* 466 F.Supp. 1114, 1125 (D.Mass.1978).

The parties agree that Gladstone offered to pay a premium for the securities, though it is unclear from the record how much of a premium he in fact offered. Gladstone solicited 49 out of the Bank's approximately 650 shareholders. Those forty-nine shareholders held approximately 22% of the Bank's outstanding stock. These facts establish an aggressive, privately negotiated buying campaign. They fall short, however, of establishing a tender offer.

The Bank argues that Gladstone made a public announcement in his Amendment 5 that he intended to acquire control of the Bank. But Amendment 5 was not filed until October 13, 1983, after Gladstone had stopped soliciting the options. The Bank also maintains that Gladstone announced his intent to take over the Bank in the September 1, 1983, proposed voting trust agreement. That was not, however, an offer by Gladstone to buy shares, but was merely an attempt to convince other shareholders to establish a voting trust for joint control of the Bank. It was entirely separate from Gladstone's personal acquisitions and was not a statement of his personal intention to take control of the Bank.

The Bank claims that the terms of the offer were fixed and not negotiable. But Gladstone's unrefuted affidavit shows that at least two of the shareholders contacted by Cain negotiated terms different from those contained in Gladstone's standard option proposal. The Bank argues, without evidentiary support, that the offer was open for only a limited time period. The option agreements, however, do not by their terms require the shareholder to accept the offer within any period, and Cain's unrefuted affidavit states affirmatively that stockholders who requested time to consider the offer were granted it.

The Bank claims Gladstone subjected shareholders to "repeated telephone solicitations and personal visits and other high pressure tactics." Gladstone's affidavits deny the use of any pressure tactics or repeated phone solicitations, and the only evidence the Bank offers of pressure tactics is the affidavit of David A. Covitz, who stated that Cain called him twice "and exerted pressure upon [him] to accept the offer." Covitz affidavit at ¶ 4. None of the other offerees who submitted affidavits on the Bank's behalf alleged use of any pressure tactics. The Bank does not allege that the offers were contingent on tender of a fixed minimum number of shares, nor did Gladstone set a maximum number of shares he would accept.

The record here falls short of establishing the high-pressure, take-it-or-leave-it, rapid accumulation of stock that normally signals a tender offer. For that reason, I rule it is unlikely the Bank will prevail on the merits of its § 14 claim. The motion for preliminary injunction for violations of § 14 should be denied.

*RICO*

RICO makes it "unlawful for any person through a *pattern of racketeering activity* ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b) (emphasis added). A "pattern" is defined by the statute as "at least two acts of racketeering activity" within a period of ten years. 18

*Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 597 n. 22 (5th Cir.1974), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

U.S.C. § 1961(5). "Racketeering activity" includes "any offense involving ... fraud in the sale of securities." 18 U.S.C. § 1961(1)(D).

■ I rule that it is unlikely the Bank can establish that Gladstone committed two acts of racketeering activity within ten years and I rule that relabelling the same claims as a RICO cause of action affords no grounds for a preliminary injunction. The motion for preliminary injunction should be denied.

Order accordingly.