**LUDLOW CORPORATION**

v.

**TYCO LABORATORIES, INC. and AMBG Corporation.**

**Civ. A. No. 81–1640–Z.**

United States District Court,
D. Massachusetts.

July 30, 1981.

Gerald F. Rath, H. Lawrence Tafe, III, Peter L. Resnik, Richard C. Heidlage, Herrick & Smith, Boston, Mass., Gregory P. N. Joseph, Marc P. Cherno, Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiff.

James S. Dittmar, Berman, Dittmar & Engel, Boston, Mass., Jonathan J. Lerner,

James E. Lyons, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants.

## MEMORANDUM AND ORDER

ZOBEL, District Judge.

Plaintiff brought this action under Section 27 of the Securities Exchange Act of 1934 (The "1934 Act"), 15 U.S.C. § 78aa, to redress alleged violations by defendants of Sections 13(d), 14(d) and 14(e) of the 1934 Act, 15 U.S.C. §§ 78m(d), 78n(d) and 78n(e), (the Williams Act Amendment) and of the Investment Company Act of 1940, 15 U.S.C. § 80a–1, *et seq.* The complaint includes prayers for injunctive and declaratory relief, for damages and for an order requiring defendants to divest themselves of all of plaintiff's stock acquired by them. Plaintiff moved for a temporary restraining order and a preliminary injunction on the ground that defendants had filed inaccurate Schedules 13D in violation of Section 13(d) of the 1934 Act and that they had by their program of purchasing stock in plaintiff company engaged in an illegal "creeping" tender offer in violation of Sections 14(d) and (e) of the Act.

On July 2, 1981, I entered an order temporarily restraining defendants from acquiring any additional shares of the common stock of plaintiff corporation. The order was based on a determination that defendants' activities had raised sufficient question as to the accuracy of their 13D filings and plaintiff had, therefore, shown sufficient likelihood of success on the merits of their Section 13(d) claim to warrant further inquiry. I specifically declined to grant injunctive relief under Section 14.

After the parties failed to negotiate a resolution of this dispute, I heard plaintiff's motion for a preliminary injunction on July 23, 1981. That motion was also premised on alleged violations of Sections 13 and 14, and the motion, as well as the opposition thereto were buttressed by lengthy briefs and extensive affidavits including numerous excerpts of depositions of brokers, purchasers, persons providing information to the investment community, officers of defendant, and a director of plaintiff, together with relevant documents. On July 24, 1981 I issued a preliminary memorandum and order denying plaintiff's motion on the ground that plaintiff had failed to show likelihood of success on the merits of its Section 14 claim and that an injunction was no longer appropriate with respect to its Section 13 claim. Following are the reasons for that ruling and the findings on which it is based.

*Findings of Fact*

After consideration of the affidavits, deposition testimony, and documents submitted by both parties, I find the facts as follows.

Plaintiff Ludlow Corporation is a publicly owned corporation organized under the laws of Massachusetts, with its principal executive office in Massachusetts. Its common stock is registered pursuant to Section 12 of the 1934 Act. As of January 3, 1981 there were issued and outstanding 3,079,142 shares of common and approximately 214,-600 shares of preferred stock of Ludlow. Plaintiff had approximately 5,700 common shareholders of record as of February 10, 1981.

Defendant Tyco Laboratories is a Massachusetts corporation with a principal executive office in Exeter, New Hampshire. Defendant AMBG, also a Massachusetts corporation, is a wholly owned subsidiary of Tyco.

In early 1979, as a result of the second of two tender offers Tyco and AMBG acquired 9.4% of the common stock of Ludlow. Tyco at that time had announced its intention to gain control of plaintiff but, for various reasons, including extensive litigation between these parties, subsequently abandoned the attempt. On May 10, 1979 Tyco filed a Schedule 13D setting forth its holdings of Ludlow but renouncing its intention to seek control.

Sometime in March, 1981, Joseph Gaziano, President and Chairman of the Board of Tyco, reevaluated Tyco's investment intentions with respect to Ludlow, and a meeting of Tyco's Board of Directors on March 17, 1980 approved a stock acquisition program up to a ceiling of fifteen million dollars.

On March 31, 1981, Tyco filed Amendment No. 1 to its 1979 Schedule 13D, announcing its intention "to purchase additional Shares when and if Shares become available for purchase at what the purchaser and Tyco consider to be reasonable prices. Such purchases may be made in open market transactions or privately negotiated transactions." This amended 13D, like all Schedules 13D, was publicly available, and it was "picked up" and publicized by brokers, subscription services and Wall Street analysts. On the same day, Gaziano instructed Thomas Ryan of Kidder, Peabody & Co. Inc., Tyco's broker, to begin a program of purchases of Ludlow common stock, at or near the prevailing market price.

During the months of April, May, and June, 1981, Tyco acquired an additional 585,200 shares of Ludlow stock, bringing its total holdings to 885,200, or approximately 28% of all outstanding shares. Defendants purchased both on the open market and through privately negotiated block purchases on 52 separate trading days; there were an additional 10 trading days during the period when they completed no transactions. Tyco frequently purchased Ludlow stock at its lowest price for the day of purchase. On several occasions it bought at or below the previous day's closing price. Some of the block purchases defendants did negotiate at prices slightly higher than the prevailing market price; others they consummated at prices just under the market price for the day. During this period, the price of Ludlow shares rose gradually from $12.75 to over $19.00.

Ludlow focuses on certain activities and particular purchases by Tyco to show that the latter had engaged in an illegal "creeping" tender offer. It charges that Tyco solicited by the use of Autex, an electronic system which disseminates securities information to subscribing investors. On April 1, 1981, Kidder, Peabody, Tyco's broker, announced in a one-day "interest message" to institutional investors its readiness to buy Ludlow shares. The message, which did not identify Tyco as the putative purchaser, was broadcast for one day only but could have been called up during the following three months by any subscriber requesting a "recap." Thomas Ryan testified at his deposition that he did not recall authorizing the message and that it might have been transmitted on behalf of a buyer other than Tyco. In the absence of any evidence that either Ryan or anyone else on behalf of Tyco authorized the message, and in light of the testimony that it might have been generated for another interested buyer, I am not persuaded that the Autex message was, as plaintiff argues, a "significant component" of Tyco's alleged solicitation program. Kidder did utilize Autex to announce its completion of three large block purchases of Ludlow stock, but again without identifying Tyco as the buyer.

Ludlow charges that defendants solicited from Massey-Burch Investment Group, Inc. a 65,800 share block purchased on June 11, 1981 and that the latter's president and portfolio manager, Lucius Burch, was pressured to make a quick decision whether to sell at a premium. The chronology of events is essentially undisputed. Harold Geneen, a friend and business associate of Burch, telephoned Gaziano and informed him that Massey Investment was interested in selling the large block of shares. Gaziano told Geneen that he, Gaziano, could not call Burch, but that if Burch was interested, he should contact Gaziano directly. Burch did so, on June 7, and according to his deposition testimony, offered to sell his stock "in the range of sixteen and a half to seventeen," a price which represented a premium over the then prevailing market price of approximately 15, the price at which Gaziano offered to sell. Gaziano declined to buy at that time. However, on June 11, when the market price had risen to 16⅝, Gaziano called Burch and offered to buy the block at the then current market price of 16⅝. Burch agreed and the transaction was completed.

Ludlow also charges undue pressure on the seller in the purchase of 54,800 shares from Morgan Guaranty Trust Co. on June 26, 1981. Again the underlying facts are not seriously in dispute. Adams, Harkness,

and Hill ("AH&H"), acting as Morgan's broker, first contacted plaintiff and offered to sell to plaintiff Morgan Guaranty's holdings of Ludlow stock. Plaintiff declined. Joseph Vita, the AH&H broker, then contacted Gaziano and offered to sell the shares at $20 per share. Gaziano countered with a price of $18 per share, the last sale price. An hour or two later he raised his offer to $18½. Vita replied that it appeared to him that Morgan Guaranty would not sell the stock below 19. Gaziano then informed Vita that 18½ was his "best bid," that the offer would remain open only that day, a Friday, and he could not guarantee that the offer would still be open on Monday morning. Vita informed Morgan Guaranty of Gaziano's offer of 18½, but did not relay Gaziano's "no guarantees" time limit on the offer. Later the same afternoon, Morgan Guaranty agreed to sell at 18½, and the sale was effected.

During the months of April, May and June, Tyco filed a series of Amendments to its Schedule 13D simply stating that Tyco intended to purchase Ludlow stock and reporting such purchases. The Tyco-Ludlow litigation which had commenced during Tyco's 1979 attempt to attain control of Ludlow, and which had been pending since then, was dismissed by stipulation of both parties in March of 1981. The coincidence of the termination of that litigation and the commencement of a new buying program of Ludlow stock permits the inference that the first ten amendments to Schedule 13D were not entirely accurate.

On June 26, 1981 Tyco filed Amendment No. 11, which altered the Statement of Purpose to say that "the purchaser and Tyco are considering the possibility of seeking to acquire control of Ludlow, but no determination has been made in this regard," and restating Tyco's intention to continue buying shares "when and if shares become available" at "reasonable prices." Subsequent amendments to Tyco's 13D included a description of the instant litigation between the parties, with copies of this Court's Memorandum and Order of July 2, 1981. In its most recent amendment dated July 16, 1981, Tyco described its July 15, 1981 offer

to enter into a business combination with Ludlow, whereby Ludlow would become a wholly-owned subsidiary of Tyco. As an exhibit to the Amendment, Tyco filed its letter to Ludlow detailing the terms of the offer, including its proposal to make a cash tender offer to Ludlow shareholders at certain set prices. The offer was rejected by Ludlow's Board of Directors at its July 21, 1981 meeting.

*Applicable Law*

In enacting the Williams Act Congress adopted a two pronged approach to regulate the accumulation of large amounts of a company's stock which may shift control of that company. See *City Investing Co. v. Simcox*, 633 F.2d 56, 62 n.14 (7th Cir. 1980). Tender offers which are regulated under Section 14(d) and the correlative regulations of the Securities and Exchange Commission ("SEC"), are subject to extensive disclosure requirements *prior* to commencement of the offer and they must comply with prescribed procedural and substantive rules. Other large scale acquisitions of a company's stock are regulated under Section 13(d) which requires only certain less stringent disclosures *after* such acquisitions exceed five percent of the total securities outstanding.

The issue presented by plaintiff's Section 13(d) claim centers on the appropriate relief given defendants' recent 13D filings.

The underlying purpose of Section 13(d) is to provide investors and the market in general with accurate information about potential changes in corporate control, so as to permit the market to value the shares accordingly, but without using the medium of federal regulation to tip the balance in favor of either management, or those attempting a change in corporate control. *General Aircraft Corp. v. Lampert*, 556 F.2d 90, 94 (1st Cir. 1977). The Court's primary concern in shaping relief is to ensure that accurate information will be made available, and that any inaccurate or misleading statements will be corrected. Beyond requiring compliance with the dictates of Section 13(d), injunctive relief is limited to

situations in which the traditional equitable requirements of irreparable harm and likelihood of success on the merits have been met. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). In *Rondeau*, the Supreme Court considered the availability of injunctive relief to remedy a 13(d) violation following compliance by the alleged violator with the reporting requirements, and found such relief unwarranted. Future sellers would be protected by the newly available disclosures, the Court found, while "those persons who allegedly sold at an unfairly depressed price have an adequate remedy by way of an action for damages, thus negating the basis for equitable relief," *id.* at 60, 95 S.Ct. at 2076. In denying an injunction, where the alleged 13(d) deficiency had been cured, the Second Circuit noted that injunctive relief under § 13(d) will issue "only on a showing of irreparable harm to the interests which that section seeks to protect.... Those interests are fully satisfied when the shareholders receive the information required to be filed." *Treadway Companies Inc. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir. 1980). *See also General Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir. 1977), *Chromalloy American Corp. v. Sun Chemical Corp.*, 611 F.2d 240 (8th Cir. 1979).

In the instant case, whatever ambiguity or confusion may have been created by Tyco's April, May and June Schedule 13D's was dispelled by its recent filings which unequivocally set forth Tyco's intentions. This is as much as Section 13(d) requires by way of equitable relief; any person who claims to have been injured by defendants' earlier obfuscatory statements may pursue a remedy at law for damages.

The issue which determines plaintiff's Section 14 claim is whether the activities of defendants in connection with their acquisitions of Ludlow stock and their purchasing program are tantamount to a tender offer so as to call into play the disclosure and procedural protections of that Section.

A conventional tender offer, as the term is traditionally understood, involves an offeror who "typically offers to purchase all or a portion of a company's shares at a premium price, the offer to remain open for a limited time. Frequently, the obligation to purchase on the part of the offeror is conditioned on the aggregate number of shares tendered: if more than a certain number are tendered, the offeror need not purchase the excess; if less than a certain number are tendered, the offeror need not purchase any. The shareholder responding to the offer generally must relinquish control of the shares he desires to tender until the response of others is determined." *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 597 n.22 (5th Cir. 1974).

The legislative purpose behind the tender offer sections of the Williams Act "is to provide investors who hold equity interests in public corporations, material information with respect to the potential impact of any effort to acquire control of a company, sufficient time within which to make an unhurried investment decision as to whether to dispose of or retain their securities, and to assure fair treatment of the investors." *Cattlemen's Investment Co. v. Fears*, 343 F.Supp. 1248, 1251 (W.D.Okla. 1972). By its terms, the Williams Act provides such protection with respect to all tender offers; however the term "tender offer" is nowhere defined. SEC staff interpretations and interpretive case law have applied the strictures of the Act not only to the traditional formal, public tender offer, but to situations in which a close examination of the facts and circumstances surrounding a particular series of securities transactions convinced the Commission or the court that the acquiring defendant's activities constituted a tender offer in fact if not in form. See *Note: The Developing Meaning of "Tender Offers" Under the Securities Exchange Act of 1934*, 86 Harv.L. Rev. 1250 (1973).

A number of criteria have evolved for testing whether particular facts and circumstances constitute a tender offer. I note them here without necessarily endorsing them, as under none can defendants' purchasing program be characterized as a tender offer. The Harvard Law Review

*Note supra*, advocates a test which, by emphasizing the impact of the offeror's activities on shareholders, attempts to focus on the danger of improper pressures which the strictures of the Act are said to prevent. Thus, "a tender offer should include any offer to purchase securities likely to pressure shareholders into making uninformed, ill-considered decisions to sell." *Note supra* at 1281.

An alternative test, recently formulated by the Securities and Exchange Commission, identifies eight factors for the court to consider in determining whether challenged activities constitute a tender offer:

1. Whether there is an active and widespread solicitation of public shareholders for shares of an issuer;

2. Whether the solicitation is made for a substantial percentage of the issuer's stock;

3. Whether the offer to purchase is made at a premium over the prevailing market price;

4. Whether the terms of the offer are firm rather than negotiated;

5. Whether the offer is contingent on the tender of a fixed minimum number of shares, and perhaps, subject to the ceiling of a fixed maximum number to be purchased;

6. Whether the offer is open for only a limited period of time;

7. Whether the offerees are subject to pressure to sell their stock;

8. Whether public announcements of a purchasing program concerning the target company precede or accompany a rapid accumulation of large amounts of target company securities.

As listed in *Hoover Co. v. Fuqua Industries, Inc.*, C79–1062A (N.D.Ohio June 11, 1979). See also *Brascan Ltd. v. Edper Equities, Ltd.*, 477 F.Supp. 773, 791–792 (S.D.N.Y. 1979); *Macke Co. v. Allegheny Beverage Corp.*, 80–1452 (D.C.D.C. July 18, 1980); *E. H. I. of Florida, Inc. v. Insurance Co., etc.*, 499 F.Supp. 1053, 1065 (E.D.Pa.1980).

The District Court of Massachusetts articulated a third test in a recent case involving widely publicized press releases describing in some detail defendant's proposed buying program. The court concluded that "where there is 1) a publicly announced intention by the purchaser to acquire a substantial block of the stock of the target company for purposes of acquiring control thereof, and 2) a subsequent rapid acquisition by the purchaser of large blocks of stock through open market and privately negotiated purchases, such actions constitute a tender offer for purpose of § 14(d) of the statute." *S–G Securities Inc. v. Fuqua Inv. Co.*, 466 F.Supp. 1114, 1126–1127 (D.Mass.1978).

Defendants' program of large-scale acquisitions of plaintiff's stock through a series of open market transactions and privately negotiated purchases did not constitute a tender offer within the meaning of the Williams Act. As noted, the regulatory scheme established by Congress carefully distinguishes between tender offers on one hand, and large-scale stock accumulations, including privately negotiated transactions on the other. While the term "tender offer" has been found to embrace not only conventional, formally announced tender offers, but also more subtle activities designed to lead to an offer of shares, "it is by now equally well settled that market purchases of stock, however aggressive, do not constitute a tender offer." *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 449 F.Supp. 951, 961 (S.D.N.Y.1978). *Brascan Ltd. v. Edper Equities Ltd.*, 477 F.Supp. 773, 790 (S.D.N.Y.1979). To the extent that plaintiff's claims do no more than allege, and I find no more, than a particularly aggressive and successful open market stock buying program, a ruling that such activities constitute a tender offer would be the equivalent of a ruling that all large scale stock acquisition programs are subject to the strictures of Section 14. By establishing two distinct pathways within the Williams Act, one for tender offers and the other for substantial market acquisitions, Congress clearly intended that companies retain the power to engage in large-scale market transactions without prior disclosures or continuing regulation, even

where the result of such transactions may be to give the purchaser substantial stock ownership and influence over the company whose shares are purchased.

The conduct of defendants in this case, whether measured in terms of the SEC's eight-part test or in terms of its alleged pressuring effect on Ludlow shareholders, cannot properly be characterized as a tender offer.

There was no "active and widespread solicitation of public shareholders" of the type found critical in *Cattlemen's Investment Co. v. Fears*, 343 F.Supp. 1248, 1252 (W.D. Okla.1972). Neither the Autex message, which did not identify defendants, nor Tyco's legally required 13D filings constituted illegal solicitation. Moreover, on both the challenged transactions with Morgan Guaranty Trust and with Massey-Burch Investment Group, the shareholders, not Tyco or its brokers, initiated negotiations for the sale of the stock.

Defendants' transactions, both on and off the market, had none of the pressure-creating characteristics of a tender offer. No specific number of shares was sought; on the contrary, Tyco bought as many shares as were available on the market. Transactions once consummated were complete— Tyco retained no contingent right to avoid the transactions or to purchase pro rata from all offerees if a minimum or maximum number of shares was not obtained. See *Wellman v. Dickinson*, 475 F.Supp. 783, 824 (S.D.N.Y.1979). No premium over the prevailing market price was offered which might pressure a shareholder into a hasty sale. While the price of Ludlow shares did rise gradually during the buying period, a gradual rise standing alone is not equivalent to a premium. "[B]idding cautiously so as to avoid bidding up the price of the stock to excessive levels unless there was large volume available at such prices" does not constitute a tender offer, *Brascan, supra* at 789. In this connection too, I note that both Tyco and its brokers engaged in lengthy negotiations as to price on block transactions, a fact which argues against the likelihood of ill-considered decision making. In fact, Tyco initially declined the Massey-Burch offer precisely because the seller demanded a premium, and only concluded the transaction when the market price had risen to meet the seller's demand. I find too that Tyco did not set rigid time limits on its offer to purchase. Unlike the pressuring time constraints imposed on shareholders in *Wellman v. Dickinson*, 475 F.Supp. 783 (S.D.N.Y.1979), no time limits were set by defendants, who continued their purchase program over a full three month period. The "fill or kill" orders placed by Kidder constitute ordinary market behavior, not pressure-creating tactics. In the one documented instance in which Gaziano did set a one day limit on his offer to purchase a large block of shares, that time limit was never communicated by the broker to the seller.

When these significant aspects of defendants buying activities are examined together, it is clear that Ludlow shareholders were not pressured by premiums, fixed terms, limited times or active solicitation into making hasty, ill-advised decisions to sell. Privately negotiated transactions for large blocks of shares typically involved institutional investors such as Morgan Guaranty Trust, investors who were sophisticated, who had reservoirs of financial knowledge, and who frequently had access to information about Tyco's stock-buying program directly from Tyco's president with whom they negotiated. Such sophisticated offerees are "hardly the uninformed security holder unable to fend for himself, who needs the protection of the Williams Act." *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 449 F.Supp. 951, 961 (S.D.N.Y.1978). See also *Brascan, supra* at 792. I find that no undue pressure was applied by defendants to Ludlow shareholders.

Finally, Ludlow charges that Tyco's Schedule 13D's amounted, in effect, to a public announcement of an intention to acquire control, because the 13D's were noted by various Wall Street analysts, brokers, and news media, who publicized Tyco's buying program. I find that while publicity was inevitably generated by the 13D's and

the publicly consummated transactions, Tyco did not engage in the sort of aggressive publicity campaign considered critical in *S–G Securities Inc. v. Fuqua Inv. Co.*, 466 F.Supp. 1114 (D.Mass.1978). There, a public announcement was made that Fuqua "is proposing a tender offer for between 475,000 and 600,000 shares of S–G Securities Inc., at a price of $3 a share." *id.* at 1119. This widespread publicity, which "outlined with some specificity the details of the proposed buying program . . . created a risk of the pressure on sellers that the disclosure and remedial tender offer provisions of the Williams Act were designed to prevent." *id.* at 1126. In the instant case, in contrast, Tyco did not communicate directly with the media. Tyco's amended 13D revealed no fixed price and no specific number of shares sought. The most that Wall Street gossip could conclude was that large-scale acquisition program was underway. To characterize Tyco's 13D statement of intent to acquire shares as forbidden "publicity," and then to focus on the resulting media attention as the decisive factor in finding a tender offer, would be the subject any corporation's extensive market acquisition program to immediate characterization as a tender offer as soon as the required 13D had been filed. This surely is not what the Williams Act intended to accomplish.

*Conclusion*

For the reasons stated, I find that the stock buying program engaged in by Tyco between April 1 and July 1, 1981 did not constitute a tender offer within the meaning of Section 14(d) of the 1934 Act. I also conclude that injunctive relief is no longer appropriate with respect to plaintiff's Section 13(d) claim.

Accordingly, plaintiff's motion for a preliminary injunction is denied.