**ENERGY VENTURES, INC., Plaintiff,**

v.

**The APPALACHIAN COMPANY, Defendant.**

**The APPALACHIAN COMPANY, Counterclaim and Third-Party Plaintiff,**

v.

**APCO OIL CORPORATION LIQUIDATING TRUST, John G. McMillian, individually and as Trustee of Apco Oil Corporation Liquidating Trust, Thomas W. diZerega, individually and as Trustee of Apco Oil Corporation Liquidating Trust, Marshall A. Crowe, Sidney S. Lindley, Walter A. Lubanko, Rush Moody, Jr., Charles P. Neidig, and Energy Ventures, Inc., Counterclaim and Third-Party Defendants.**

**Civ. A. No. 84–200–JLL.**

United States District Court,
D. Delaware.

May 11, 1984.

Howard M. Handelman and Jeffrey Weiner of Bayard, Brill & Handelman, P.A., Wilmington, Del., and David A. Donohoe, Clint Batterton, Bruce S. Mendelsohn, Alan J. Statman, Christopher S. Vaden, Oscar de la Guardia of Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., of counsel, for plaintiff Energy Ventures, Inc. and Third-Party Defendants, McMillian, diZerega, Crowe, Lindley, Lubanko, Moody and Neidig.

Martin P. Tully, Lawrence A. Hamermesh, and Peter W. Laberee of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for The Appalachian Company.

R. Franklin Balotti, William J. Wade, Gregory P. Williams, and Gregory V. Varallo of Richards, Layton & Finger, Wilmington, Del., Richard E. Hill and Barbara A. Pollack of Steptoe & Johnson, Chartered, Washington, D.C., of counsel, for third-party defendants, The Apco Oil Corporation Liquidating Trust, McMillian and diZerega.

## OPINION

LATCHUM, Senior District Judge.

This action is before the Court on plaintiff's and defendants' motions for a preliminary injunction. On April 11, 1984, the plaintiff, Energy Ventures, Inc. ("Ventures"), filed a complaint against The Appalachian Company ("Appalachian") seeking declaratory and injunctive relief for violations of Sections 13(d), 14(d) and 14(e) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n in connection with Appalachian's acquisition of stock of Ventures. (Docket Item ["D.I."] 1.) On April 12, 1984, following the submission of briefs and affidavits of both parties, this Court denied Ventures' motion for a temporary restraining order ("TRO") based on the charges that Appalachian was conducting an unlawful tender offer for Ventures stock in violation of Sections 14(d) and (e) and failed to meet the disclosure requirements of Sections 13(d) and 14(d). (D.I. 10.) Ventures took an expedited appeal the following day, but the Court of Appeals by a written opinion on April 17, 1984, dismissed the appeal for lack of jurisdiction.

On April 19, 1984, Appalachian filed its answer, counterclaim and third-party complaint against Ventures, its directors John G. McMillian ("McMillian"), Thomas W. diZerega ("diZerega"), Marshall A. Crowe ("Crowe"), Sidney S. Lindley ("Lindley"), Walter A. Lubanko ("Lubanko"), Rush Moody, Jr. ("Moody"), and Charles P. Neidig ("Neidig"), as well as The Apco Oil Corporation Liquidating Trust ("Apco Trust")

and McMillian and diZerega as trustees of the Trust. (D.I. 21.)

Appalachian's counterclaim and third-party complaint allege that the third-party defendants have formed a group within the meaning of Section 13(d) and have violated that section by failing to file a Schedule 13D reflecting the formation of the group and disclosing the information required by that Schedule. The counterclaim and third-party complaint also charges the directors of Ventures with breach of fiduciary duty and manipulation of Ventures to perpetuate themselves in office. (*Id.*)

After the denial of the TRO, the parties were granted expedited discovery and the Court scheduled a hearing on Ventures' motion for a preliminary injunction for May 3, 1984.

Ventures' motion for a preliminary injunction is based on its claims under Sections 13(d) and 14(d) in that Appalachian's acquisition of Ventures stock amounted to an unlawful tender offer in violation of Sections 14(d) and (e) and that Appalachian violated Section 13(d) because it failed to disclose its true intentions. (D.I. 25.)

On May 1, 1984, Appalachian also moved for a preliminary injunction on its counterclaim and third-party complaint seeking to enjoin Ventures and the third-party defendants from acquiring additional Ventures shares pending filing full disclosure of the group as required by Section 13(d). (D.I. 30.) The Court heard arguments on both motions on May 3, 1984, but at that time the Apco Trust, the trustees (D.I. 40), and the individual third-party defendants (D.I. 43) moved to dismiss the third-party complaint for (1) failure to state a claim upon which relief could be given, (2) improper venue, (3) lack of jurisdiction, and (4) insufficient service of process.

## I. VENTURES' MOTION FOR A PRELIMINARY INJUNCTION

### A. *The Facts*

In the late fall of 1983, it was generally known in the energy field and by Appalachian's management that the Williams

Company would probably offer its block of Ventures stock for sale. (D.I. 36 at 7–8.) It was not, however, until January, 1984 that Appalachian's management began to focus upon acquiring the Ventures shares. (*Id.* at 10–12.) On January 25 or 26, 1984, Appalachian's Board Chairman Millard discussed with President Orlofsky the possibility of acquiring Ventures shares which had been suggested to Millard by third-party defendant McMillian. (D.I. 27 at A–12.) Appalachian then enlisted the aid of David Butters of Shearson American Express to approach the Williams Company with a view toward purchasing its Ventures shares. (*Id.* at A–15.) Butters was successful and negotiated a private Stock Purchase Agreement with Northwest Energy Company ("Northwest"),[1] dated February 6, 1984, under which Appalachian acquired 610,843 shares of Ventures common stock (about 22% of the outstanding shares) for $10.50 per share. (*Id.* at A–13 to A–15.) On February 7, 1984, Appalachian acquired an additional 350,000 Ventures shares from Mutual Shares Corporation through a broker's transaction on the over-the-counter market, at a price of $10.9375 per share, including broker's commissions. (D.I. 1, Ex. 1 at A–8.) Appalachian made additional purchases of Ventures stock in a broker's transactions in the over-the-counter market on February 10 and 13, 1984, of 7,145 and 65,000 shares, at market prices of $10.6875 and $10.9375 per share respectively, again including broker's commissions. (*Id.*) By these purchases between February 6 and 13, 1984, Appalachian acquired approximately 37% of Ventures outstanding common stock. Two days later, on February 15, 1984, Appalachian filed a Schedule 13D disclosing the purchases, as well as the other information called for by that Schedule. (D.I. 1, Ex. 1.) Specifically, Appalachian disclosed the following with respect to the purpose of its acquisition:

Item 4. Purpose of Transaction.

The purpose of Appalachian's purchase of Common Stock of Energy Ventures is to acquire a substantial equity interest in Energy Ventures and thereby to be able *to exercise a controlling influence on the management of Energy Ventures by seeking representation on the board of directors and in the management of the Company through discussions with members of such board and management,* pursuant to which Appalachian might carry out such purpose. In the future, *depending upon the success of Appalachian's discussions* with members of the board of directors and management of Energy Ventures, *Appalachian may attempt to join together with other stockholders of Energy Ventures, by proxy solicitation or otherwise, to elect a majority (or more) of the board of directors of Energy Ventures or to influence or change its management.* While Appalachian may have such discussions with other stockholders whether or not its discussions (as described above) with Energy Ventures' representatives are successful in achieving the purpose of Appalachian's purchases, Appalachian has no understanding, arrangement, agreement or proxy relationship with any other stockholder of Energy Ventures at present (other than the Stock Purchase Agreement with, and the letter granting a right of first notice from, Northwest Energy Company, as described in Item 5) and is not able to predict the willingness of other stockholders to join with it in the future in any such understanding, arrangement, agreement or proxy relationship for any purpose. Depending on market conditions and Appalachian's financial means or the availability of financing, *Appalachian may consider in the future additional purchases of shares of Common Stock in privately negotiated transactions, in the open market or otherwise.* There can be no assurance that such purchases will be made.

D.I. 1, Ex. 1 at A–5 & A–6 (emphasis added).

---

1. Northwest was a subsidiary of the Williams Company.

Between February 16 and March 26, 1984, Appalachian acquired 54,703 shares of Ventures stock in broker transactions in the over-the-counter market at prices ranging from $10.8125 to $12.5625 per share in blocks ranging in size from 1,000 to 11,500 shares. (D.I. 1, Ex. 2.) These additional purchases increased Appalachian's ownership of Ventures stock to about 39% of the outstanding shares. The dates, amounts and terms of these additional market purchases were disclosed in Amendment No. 1 to its Schedule 13D, filed on March 26, 1984. (*Id.*)

Again from March 27 through April 2, 1984, Appalachian purchased an additional 42,600 shares of Ventures stock in broker transactions in the over-the-counter market at prices ranging from $12.5625 to $12.8125 per share and in blocks ranging in size from 1,000 to 24,500 shares. (D.I. 1, Ex. 3.) These purchases were also disclosed by Appalachian in Amendment No. 2 to its Schedule 13D, filed on April 9, 1984. (*Id.*) Amendment No. 2 also disclosed that Appalachian had then acquired 40.48% of Ventures common stock. (*Id.*)

Prior to filing Amendment No. 2 to its Schedule 13D, Appalachian's and Ventures' representatives discussed in person and by telephone Appalachian's publicly announced desire to be represented on the board of directors of Ventures. (D.I. 35 at 65–66, 88, 96–98; D.I. 34 at 79–80.) On March 20, 1984, McMillian telephoned Millard and charged that Millard was backing out of a deal which he believed he had previously made with Millard. According to McMillian, the deal was that he had agreed that Millard or some entity controlled by Millard would purchase the Ventures shares offered by the Williams Company for the benefit of a partnership in which McMillian, Herbert Allen, Jr. of Allen & Co., and Millard each would have a one-third interest. (D.I. 35 at 58–59.) Millard testified that until the March 20, 1984 phone call from McMillian he never heard before of the "partnership deal." (D.I. 36 at 53–55.) The upshot of this conversation resulted in a heated discussion between McMillian and Millard. (D.I. 35 at 111–13;

D.I. 36 at 53–55.) A further face-to-face meeting was held on April 3, 1984 between McMillian and Millard at which Millard stated that any "partnership" agreement claimed by McMillian did not exist. (D.I. 36 at 62–65; D.I. 35 at 115.) As a result of the bitter dispute between McMillian and Millard, it became apparent that Appalachian would not obtain representation on Ventures' board of directors since Appalachian was "at war" with McMillian, Ventures' board chairman. (D.I. 36 at 69.)

Appalachian then, as above stated, filed on April 9, 1984, Amendment No. 2 to its Schedule 13D in order to disclose its changed purpose in acquiring Ventures shares since it had become obvious that Appalachian would not obtain board representation over McMillian's objections. Amendment No. 2 stated in part:

*Although Appalachian has sought representation on the Board of Directors of Energy Ventures through discussions with management and may continue to do so, it has not been successful in its efforts to obtain such representation. Accordingly, the present purpose of Appalachian's purchase of Common Stock of Energy Ventures is to acquire, if possible, a majority of the outstanding shares of common stock of Energy Ventures and thereby to be able to control the management of Energy Ventures by electing new members of the board of directors constituting at least a majority thereof.* Although as of April 2, 1984, Appalachian owned less than a majority of such outstanding shares of Energy Ventures (approximately 40%), Appalachian intends, to the extent shares become available from time to time, to make additional purchases of shares of Common Stock in privately negotiated transactions, in the open market or otherwise, to obtain such a majority interest. There can be no assurance that such purchases will be made. Appalachian also may attempt to join together with other stockholders of Energy Ventures, by proxy solicitation or otherwise, to influence or change the management

of Energy Ventures. While Appalachian may have such discussions with other stockholders whether or not it acquires a majority interest in Energy Ventures, Appalachian has no understanding, arrangement, agreement or proxy relationship with any other stockholder of Energy Ventures at present (other than the Stock Purchase Agreement with, and the letter granting a right of first notice from, Northwest Energy Company, as described in Item 5) and is not able to predict the willingness of other stockholders to join with it in the future in any such understanding, arrangement, agreement or proxy relationship for any purpose.

D.I. 1, Ex. 3. (Emphasis added.)

B. *Discussion*

 The standards for granting injunctive relief in this Circuit are well known. The moving party must demonstrate (1) a reasonable probability of ultimate success on the merits, and (2) that the movant will be irreparably damaged if relief is not granted. The Court should also take into account, when relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919–20 (3d Cir.1974).

Applying these standards to the facts developed by discovery, the Court concludes that Ventures has not borne its burden of showing that Appalachian has made a tender offer in violation of Section 14(d) or that Appalachian has violated Section 13(d) by failing to disclose its interest in acquiring a majority of Ventures stock and thereby control its management. Furthermore, the Court finds Ventures' belated irreparable injury argument to be without merit.

 First, the Court finds that Appalachian's acquisition of Ventures stock as recited above did not constitute a tender offer. The legislative purpose of the tender offer provisions of the Williams Act is to provide investors who hold equity interest in public corporations sufficient time within which to make an unhurried, informed investment decision as to whether to dispose of or retain their securities when a tender offer has been made. *Ludlow Corp. v. Tyco Laboratories, Inc.,* 529 F.Supp. 62, 66 (D.Mass.1981); *Cattlemen's Investment Co. v. Fears,* 343 F.Supp. 1248, 1251 (W.D.Okla.1972). While the term "tender offer" is not defined in the Williams Act, it is clear from the legislative history that the fact that Appalachian's acquisition of Ventures stock, made in a single privately negotiated transaction and a series of purchases that were executed in normal open market transactions, is not a tender offer within the meaning of the Williams Act.[2] Under the carefully structured system set up by the Williams Act, a purchaser of a substantial market position of securities through such transactions is subject rather to the disclosure requirements of Section 13(d) of the Securities Exchange Act. Under the facts of this case, Ventures by advancing the argument that Appalachian has engaged in a tender offer is in fact advocating that any major acquisition program is subject to tender offer regulation, a view that is at odds with judicial interpretation. As the courts have recognized to be "well settled" law:

> [T]he regulatory scheme established by Congress carefully distinguishes between tender offers on one hand, and large-scale stock accumulations, including privately negotiated transactions on the other. While the term "tender offer" has been found to embrace not only conventional, formally announced tender offers, but also more subtle activities designed to lead to an offer of shares, "it is by now equally well settled that market purchases of stock, however aggressive, do not constitute a tender offer." *Kennecott Copper Corp. v. Curtiss-Wright*

---

**2.** *See* M. Lipton and E. Steinberger, *Takeovers and Freezeouts* (1978) under section entitled

"What is a tender offer."

*Corp.*, 499 [sic] F.Supp. 951, 961 (S.D.N. Y.1978). *Brascan Ltd. v. Edper Equities Ltd.*, 477 F.Supp. 773, 790 (S.D.N.Y. 1979). To the extent that plaintiff's claims do no more than allege, and I find no more, than a particularly aggressive and successful open market stock buying program, a ruling that such activities constitute a tender offer would be the equivalent of a ruling that all large-scale stock acquisition programs are subject to the strictures of Section 14. By establishing two distinct pathways within the Williams Act, one for tender offers and the other for substantial market acquisitions, Congress clearly intended that companies retain the power to engage in large-scale market transactions without prior disclosures or continuing regulation, even where the result of such transactions may be to give the purchaser substantial stock ownership and influence over the company whose shares are purchased.

*Ludlow Corp. v. Tyco Laboratories, Inc.*, 529 F.Supp. 62, 67–68 (D.Mass.1981). *Accord Brascan Ltd. v. Edper Equities Ltd.*, 477 F.Supp. 773, 790–91 (1979)("The consequences of bringing such large-scale open market and privately negotiated purchases within the scope of [Section 14(d)] would be to rule, in effect, that no large-scale acquisition program may be lawfully accomplished except in the manner of a conventional tender offer, ... [and] nothing in the legislative history or the text of the Williams Act ... suggests that [Congress] intended to bring about such consequences.").

The logical conclusion that Appalachian's acquisitions, that were effected through a negotiated deal and normal open market transactions, did not force on other Ventures stockholders the necessity to make a hurried, uninformed investment decision whether to sell their shares to Appalachian, is strongly reinforced by a reference to the factors suggested by the SEC as characteristic of a tender offer. The SEC standard, first set out in its *amicus curiae* brief in *Brascan, Ltd. v. Edper Equities, Ltd.*, 477 F.Supp. 773, 791 (S.D.N.Y.1979), is the

"tool most commonly used by the courts in recent years as an aid in determining whether a purchase program is the equivalent of a tender offer ...." A. Fleischer, *Tender Offers: Defenses, Responses and Planning* (1983) at 132. The SEC's criteria are as follows:

1. Whether there is an active and widespread solicitation of public shareholders for shares of an issuer;

2. Whether the solicitation is made for a substantial percentage of the issuer's stock;

3. Whether the offer to purchase is made at a premium over the prevailing market price;

4. Whether the terms of the offer are firm rather than negotiated;

5. Whether the offer is contingent on the tender of a fixed minimum number of shares, and perhaps, subject to the ceiling of a fixed maximum number to be purchased;

6. Whether the offer is open for only a limited period of time;

7. Whether the offerees are subject to pressure to sell their stock;

8. Whether the public announcements of a purchasing program concerning the target company precede or accompany a rapid accumulation of large amounts of target company securities.

*Ludlow Corp. v. Tyco Laboratories, Inc.*, *supra*, 529 F.Supp. at 67 (D.Mass.1981). *See also Polinsky v. MCA Inc.*, 680 F.2d 1286, 1290–91 (9th Cir.1982); *Crane Co. v. Harsco Corp.*, 511 F.Supp. 294, 302–03 (D.Del.1981); *Brascan Ltd. v. Edper Equities, Ltd.*, *supra*, 477 F.Supp. at 791–92; *E.H.I. of Florida, Inc. v. Insurance Company of North America*, 499 F.Supp. 1053, 1065 n. 8 (E.D.Pa.1980), *aff'd*, 652 F.2d 310 (3d Cir.1981); *and see University Bank & Trust Company v. Gladstone*, 574 F.Supp. 1006, 1010–11 (D.Mass.1983).

Applying these criteria *seriatim* to the facts of this case, it is clear that the purchases did not involve a "tender offer."

(1) There is no evidence of any "active and widespread solicitation of public share-

holders." Indeed, the evidence discovered during expedited discovery shows that the 350,000 share block came from a single willing seller and was purchased at the over-the-counter market price. (D.I. 49 at 33–34.) In addition, the testimony indicated that Appalachian did not "go out and direct a group of brokers to aggressively solicit purchases" of Ventures stock. (*Id.* at 35–36.) Appalachian purchased shares only in broker's transactions at market prices in the over-the-counter market pursuant to specific instructions to the broker not to offer to purchase shares at greater than prevailing market prices, not to impose any time limit on the offers to purchase and not to advertise for offers to sell shares. (D.I. 29, Int. 5; D.I. 37 at 31–32; D.I. 49 at 29.) The evidence shows there was no active and widespread solicitation of Ventures shares by Appalachian and aside from the privately negotiated purchase from the Williams Company, all purchases were over-the-counter transactions.

Ventures also contends that when Appalachian sought on March 1, 1984 to negotiate the purchase of 900,000 Ventures shares from the Apco Trust (D.I. 37, Ex. 1), that constituted widespread solicitation of public shareholders because the beneficiaries of the Trust were so numerous. The Court disagrees. The evidence is clear that Appalachian made no contact with the Apco Trust beneficiaries (D.I. 37 at 109–11), and the Apco Trustees believed they had no need to communicate to the Trust beneficiaries because the $12 offer was too low. (D.I. 35 at 130–31; D.I. 34 at 40.)

(2) There was no "public" solicitation by Appalachian at all and the only public disclosure concerning Appalachian's purchase of Ventures stock was contained in its required Schedule 13D filings. These 13D filings, however, cannot be considered "illegal solicitations" nor can the "publicity … inevitably generated by the 13D's and the publicly consummated transactions" disclosed thereby be considered an "aggressive publicity campaign." *Ludlow v. Tyco*, 529 F.Supp. at 68–69.

(3) The evidence also does not indicate that any of Appalachian's purchases of Ventures stock were made at a premium over the prevailing market price. Except for the first negotiated purchase, all other purchases were broker's transactions in the over-the-counter market at market price. Ventures' further argument that Appalachian offered to purchase Apco Trust shares of Ventures at $.25 over the *bid* price amounted to a premium although below the *asked* price. There is no merit to this contention as the offer was *below* market—an average between *bid* and *asked*. (D.I. 35 at 130; D.I. 34 at 148.)

(4) No evidence has been produced to indicate that Appalachian purchases were based on firm "take it or leave it" offers. The first purchase was a negotiated sale and all other purchases were all open market broker's transactions. The fact that some of the open market purchases were at the same price is not indicative that they resulted from a pattern of firm offers.

(5) There is no evidence that Appalachian's purchases were contingent upon the tender of a minimum number of shares, nor were any of the purchases subject to a ceiling on the number of shares to be purchased. Ventures argues that because Appalachian withdrew its offer to purchase Ventures shares held in the Apco Trust raises the inference that it was on a "take it or leave it basis." This argument is meritless. The evidence indicates that the offer was suspended because of the probable effects on the market price of the stock with the declaration of $4.50 dividend by Ventures and the royalty trust that was proposed. (D.I. 37, Ex. 3.)

(6) and (7) There is no credible evidence that Appalachian ever announced any time limit on an offer to purchase Ventures stock or that anyone was subject to "pressure" to sell their stock. Ventures suggests that the offer to the Apco Trustee created such "pressure." However, the record is to the contrary. (D.I. 34 at 127; D.I. 33 at 67; D.I. 35 at 128–30.)

(8) Finally, the evidence has not revealed that Appalachian made any public an-

nouncement prior to or accompanying any large accumulation of Ventures stock. Appalachian purchased 1,032,988 shares of the 1,177,591 shares of Ventures which it owned prior to any publicly announced stock purchasing program.

Having considered their criteria, this Court must conclude on the basis of the elaborate discovery record developed that Ventures has not borne its burden of demonstrating that Appalachian's purchases amounted to a "tender offer" which would require Appalachian to comply with Section 14(d).

■ The Court now turns to Ventures' second charge of Appalachian's Securities Act violation. Ventures contends that Appalachian's original Schedule 13D and Amendment No. 1 thereto violated Section 13D by failing to disclose Appalachian's alleged decision to acquire a majority of the common stock of Ventures and thereby control its management and board of directors. This charge rests upon the inference that having disclosed that intention on April 9, 1984, Appalachian must have secretly harbored that intention much earlier, and the explanation provided by Appalachian for its change of intention is unworthy of belief.

Appalachian's explanation—that its efforts to obtain board representation through discussion with management had reached an impasse by April 3—is supported by the record. (D.I. 35 at 55–56, 63–64.) By contrast, the record does not support Ventures' claim that the Appalachian board of directors had decided to actually initiate the acquisition of a majority of Ventures stock by March 20, 1984. Appalachian's Chairman Millard testified that on March 20, the day of the heated phone call from McMillian in which Millard told McMillian that he had never heard of a partnership deal in which McMillian and his friend Herbert Allen would get two-thirds of Appalachian's Ventures shares, the Appalachian Board considered that:

under the circumstances we better—the *possibility* was brought to everybody's attention that under those conditions we *might perhaps* really do everything in our power to acquire the majority of the stock.

D.I. 35 at 58 (emphasis added). Ventures claims to the contrary that the Appalachian Board resolved on March 20 to acquire a majority of Ventures stock. This claim is not supported by the evidence. Director Dutton testified that he did not recall any such action and, in fact, Appalachian's purpose as of March 20 was not clearly defined. (D.I. 45 at 25.) Millard testified that the Board on March 20 ratified prior purchases, but he could recall no other corporate action taken on March 20. (D.I. 36 at 56–58.) In short, there is no support for Ventures' claim that Appalachian had formulated an intention to acquire a majority as of March 20, and that its Amendment No. 2 filed on April 9 did not promptly follow the formulation of that intention.

Thus, there is no record support for Ventures' claim that Appalachian's Schedule 13D did not fully disclose its purpose in acquiring Ventures stock.

To the contrary, as this Court found at the temporary restraining order stage, Appalachian's initial filing under Section 13(d) gave ample notice of its intentions. It made it clear that Appalachian intended "to exert a controlling influence on the management of Energy Ventures by seeking representation on the board of directors." Appalachian's initial filing also disclosed the possibility that it might acquire additional shares, and that it might, depending on the success of its discussions with Ventures' current directors and management, "join together with other stockholders of Energy Ventures, by proxy solicitation or otherwise, to elect a majority (or more) of the board of directors of Energy Ventures or to influence or change its management." Thus, Appalachian has from the outset fully disclosed its intention to acquire a controlling influence over Ventures. This Court adheres to its views expressed at the temporary restraining order hearing that "it seems to me in reading what defendants disclosed, that what they said they were

going to do, that is what they have done...." (D.I. 10.)

In any event, any claim that Appalachian's initial filing was inadequate appears to be moot. By Amendment No. 2 to its Schedule 13D, Appalachian stated its intention "to acquire, if possible, a majority of the outstanding shares of common stock of Energy Ventures and thereby ... be able to control the management of Energy Ventures by electing new members of the board of directors constituting at least a majority thereof." This is precisely the disclosure that Ventures claims was improperly omitted from Appalachian's prior filings. Thus, even under Ventures' unsupported theory, a subsequent filing has now cured any prior nondisclosure.

■ Under these circumstances, interim injunctive relief is not available under Section 13(d). *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir.1980); *Condec Corp. v. Farley*, 573 F.Supp. 1382, 1386 (S.D.N.Y.1983); *Avnet, Inc. v. Scope Industries*, 499 F.Supp. 1121 (S.D.N.Y.1980). Once there has been compliance with Section 13(d) through a corrective filing, the purpose of the law has been fully served and there is no threat of continuing harm to the issuing corporation or its shareholders which would justify injunctive relief. *Rondeau v. Mosinee Paper Corp.*, *supra*, 422 U.S. at 59–60, 95 S.Ct. at 2076; *Treadway Companies, Inc. v. Care Corp.*, *supra*, 638 F.2d at 380.

■ Any person who claims to have been injured by defendant's earlier statements may pursue a remedy at law for damages. *Ludlow Corp. v. Tyco Laboratories, Inc.*, 529 F.Supp. at 66. Ventures has submitted no evidence whatever to demonstrate that Appalachian would be unable to answer in readily ascertainable monetary damages should its filings with the Securities and Exchange Commission be found to be inadequate. Furthermore, the drastic remedies of sterilization and rescission which Ventures seeks are inappropriate at the *preliminary* stage and should be only used after a full hearing on the merits, if ever. *See Hanna Mining Co. v. Norcen Energy Resources, Ltd.*, 574 F.Supp. 1172, 1202–03 (N.D.Ohio 1982) (any application of a rescission remedy must await a full hearing); *compare Riggs National Bank v. Allbritton*, 516 F.Supp. 164, 182 (D.D.C.1981) (injunction would not have issued against defendant's securities law violations but for failure to comply with the substance of the Change in Bank Control Act of 1978). This Court has previously articulated the concerns which compel most courts to defer the application of drastic remedies until after a full hearing on the merits:

> Pabst would have the Court enter an order enjoining the Committee from conducting any further solicitation of consents until the next annual meeting of Pabst's shareholders ... in order to afford a "cooling off" period for the allegedly disruptive tactics of the Committee.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The seven-month "cooling off" period urged by Pabst is too drastic a remedy because such relief, in addition to correcting the defects, would operate to punish the Committee. Such punishment, in the present circumstances, contravenes the purpose behind the federal securities laws. *See General Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (C.A. 1, 1977).
>
> The Court does recognize the propriety of requiring corrective disclosures in order to provide the shareholders with relevant and material information for them to make an informed decision. *See Jacobs v. Pabst Brewing Co.*, C.A. No. 82–449, D.I. 20 at 9 (D.Del. July 21, 1982). The Court will thus order that corrective disclosures be made in the event the Committee decides to proceed in its efforts through the solicitation of consents process.

*Pabst Brewing Co. v. Jacobs*, 549 F.Supp. 1068, 1079 (D.Del.1982). Consequently, even had Ventures established the probability of a Section 13(d) violation by Appala-

chian (which this Court has not found), that violation appears to be mooted by the second amendment to its Schedule 13D and would in no way be properly subject to the drastic and punitive remedies plaintiff seeks.

■ The Court therefore concludes that Ventures has failed to demonstrate that it will ultimately prevail on the merits of its claims that Appalachian violated either Section 14(d) or 13(d) and that it has not borne its burden of showing irreparable and immediate harm. An order will be entered denying Ventures the preliminary injunctive relief which it seeks.

## II. APPALACHIAN'S MOTION FOR PRELIMINARY INJUNCTION

As noted above, Appalachian filed a counterclaim and third-party complaint on April 19, 1982, in which it alleged that the third-party defendants had formed a group within the meaning of Section 13(d) and have violated that provision by failing to file a Schedule 13D reflecting the formation of the group and information to be disclosed therein. The counterclaim and third-party complaint also charge the directors of Ventures with a breach of their fiduciary duty and the manipulation of Ventures' corporate machinery to perpetuate themselves in office. (D.I. 21.) Two days before the injunction hearing, Appalachian moved for a preliminary injunction on its counterclaim and third-party complaint, seeking to enjoin Ventures and the third-party defendants from acquiring any additional Ventures shares, and otherwise exercising the rights of Ventures' stockholders, pending the filing of the disclosures required by Section 13(d). (D.I. 30.) At the injuction hearing on May 3, 1984, the third-party defendants filed motions to dismiss, raising among other things, jurisdiction over the third-party defendants, improper venue, and insufficiency of service of process. (D.I. 40 & 43.) In addition, Appalachian on May 7, 1984, has filed an answer, amended counterclaim and third-party complaint. (D.I. 48.)

Because of the expedited schedule in which the preliminary injunction hearing was held, the parties understandably did not address the motions to dismiss filed by the third-party defendants to any extent. Because the motions raise serious issues as to personal jurisdiction, venue and sufficiency of service of process, the Court, in its discretion, will decline at this time to rule on Appalachian's motion for a preliminary injunction but will await further and more extensive briefing of these issues. Accordingly, the Court will enter an order declining to rule on Appalachian's motion for a preliminary injunction until these jurisdictional issues are resolved.

This opinion shall constitute the findings of fact and conclusions of law required by Rule 52(a), Fed.R.Civ.P.

An order will be entered in accordance with this opinion.